[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 27, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-16577

_____

D. C. Docket No. 04-00179-CR-WBH-5-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TERRY DVAUGHN WOODARD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 27, 2008)**

Before TJOFLAT, ANDERSON and COX, Circuit Judges.

TJOFLAT, Circuit Judge:

On March 24, 2004, a Northern District of Georgia grand jury returned a five-count indictment against Terry Dvaughn Woodard, the appellant, and three others, Shedia Glover, Donnie Spencer, and David Thomas.[1] Count One charged all four defendants with violating 21 U.S.C. § 846[2] by conspiring to possess and distribute marijuana, a violation of 21 U.S.C. § 841(a)(1);[3] Count Two charged these four defendants with violating § 841(a)(1); Counts Three and Four charged Spencer and Thomas, respectively, with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 § U.S.C. 924(c)(1)(A);[4] Count Five

---

[1] Ricardo Monroe was also named in the indictment. He played no role in the events forming the basis for this appeal.

[2] 21 U.S.C. § 846 provides that:

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

[3] 21 U.S.C. § 841(a)(1) (2002), in effect at the time of the offense, provided that:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally – (1) to . . . possess with intent to . . . distribute . . . a controlled substance.

[4] 18 U.S.C. § 924(c)(1)(A) (2003), in effect at the time of the offense, provided that:

Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to . . . any . . . drug trafficking crime (including a . . . drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such . . . drug trafficking crime – (i) be sentenced to a term of imprisonment of

charged Woodard with the same offense. Pursuant to plea agreements with the Government, Glover pled guilty to Count One and Thomas pled to a misdemeanor drug offense.[5] Woodard was tried, convicted on Counts Two and Five, and sentenced to consecutive prison terms of one year and a day on Count Two and five years on Count Five.

Woodard now appeals his convictions, seeking either their reversal on the ground that the evidence was insufficient to convict, or a new trial based on rulings the district court made during the course of the trial. We affirm.

**I.**

A.

Woodard's trial commenced on July 17, 2006, and lasted four days.[6] The Government called eight witnesses to the stand. Two were men who had been indicted with Woodard, Shedia Glover and David Thomas, but had already pled guilty. Three witnesses worked for the U.S. Postal Service, two as Postal Inspectors; two were Atlanta Police Department ("APD") officers; and one was a forensic chemist with the Georgia Bureau of Investigation ("GBI"). The testimony

---

not less than 5 years.

[5] Spencer is awaiting trial, having been granted continuances for health reasons.

[6] Woodard's trial was initially set for July 19, 2004, but the district court granted multiple continuances.

of the Postal Service employees and the APD officers portrayed the events that led to Woodard's (and the others') arrests. The testimony provided by Glover and Thomas reinforced the Government's case on Counts One and Two by portraying Woodard as a marijuana trafficker.

From November 12, 2003, to January 29, 2004, seven cardboard packages, all weighing roughly sixty pounds, were sent from Brownsville, Texas, and Harlingen, Texas,[7] via the U.S. Postal Service's Express Mail service to a house at 141 Stafford Street in Atlanta, Georgia ("the residence"). All of these packages passed through the Morris Brown post office in Atlanta before being delivered. The staff at the Morris Brown office grew increasingly suspicious of the contents of these packages because they were addressed to a variety of different businesses but were being sent to a residential address.[8] Upon receipt of two packages on January 29, the staff raised their concerns about the packages to Robert King, the manager of the Morris Brown office. King contacted Postal Inspector Sharon

---

[7] Brownsville and Harlingen are neighboring cities, both located in Texas on the border between the United States and Mexico.

[8] The first three packages, one mailed on November 12, two on December 8, were sent from Brownsville and labeled as originating from Bush Supply Company and were addressed to McCord Enterprises. The next two packages, both mailed on January 12, were also sent from Brownsville, but were labeled as originating from Square D and were addressed to Square D. The final two packages, which arrived at the Morris Brown post office on January 29, were sent from Harlingen and also were addressed as originating from and being sent to Square D.

4

Williams, who worked in the narcotics section of the Inspectors Service, and informed her of these suspicious packages.

On January 30, Williams arranged a "line-up" for the packages – each package was placed among several dummy packages and a narcotics detection dog was brought in to check the "line-up." The dog identified both of the suspicious packages as containing narcotics. Williams then secured a search warrant and, assisted by Inspector Clinton Potter, cut into the packages. Inside, they found a large plastic container that was wrapped in plastic and contained a smaller, "RubberMaid type container."[9] Inside this container was a "large bundle . . . with plastic wrapped around it several times . . . cover[ed] with a red oily substance." The Inspectors cut into the large bundle and performed a field test on the container's contents, which weighed roughly fifty pounds. The test revealed that the contents were marijuana.

Inspector Williams contacted the APD's Major Narcotics Team on February 2 and they arranged for a controlled delivery to occur on February 3. Williams would pose as a Postal Service employee delivering the packages while members of the APD Narcotics Team would raid the residence after the packages were

---

[9] The quoted description of the packages comes from Inspector Williams's testimony at trial.

delivered.

On February 3, prior to the controlled delivery, Robert King received a phone call from an unidentified male asking about when the packages would be delivered to the residence. The unidentified caller was concerned because the packages had been sent via Express Mail and were several days overdue.[10] King informed the caller that the packages would be delivered that day, but did not provide a specific time of delivery.

Around 1:30 p.m., Inspector Potter and Officer Zandra Jackson of the Narcotics Team parked across the street from the residence to observe the upcoming controlled delivery. Jackson saw several men standing in the front yard of the residence, including Woodard.[11] Moments later, they witnessed four vehicles arrive at the residence, including a white Toyota Camry and a silver GMC pickup truck.

At approximately 2:00 p.m., Williams arrived, stepped out of the Postal

---

[10] The Express Mail service guarantees that a package will be received within one to two days from the time it is mailed. The recipient of mail delivered via this service must sign a receipt.

[11] Jackson testified that she saw a man in a Miami Dolphins, "Dan Mareno" jersey in the front yard of the house. She did not specifically identify the man in the jersey as Woodard. Several other witnesses, however, stated that Woodard was wearing this jersey. In addition, Woodard, in his brief to this court, effectively concedes that he was the individual wearing the "Dan Mareno" jersey.

Service delivery van, and walked toward the residence. Before she reached the front door, Woodard greeted her. She informed Woodard that she had two packages and that "someone had to sign for them." Woodard, who did not live at the residence, offered to sign and then both printed and signed the name "Tom Smith" on the signature card for the packages. Williams told Woodard that the packages were heavy and asked him to lift them off the back of the van. He took the first package from the van and placed it in the bed of the silver GMC pickup truck, which was parked close to the van. Woodard then yelled to a woman sitting on the front porch of the residence to "tell Donnie to come and help me." The woman went inside to get Donnie Spencer, who was leasing the residence. Spencer came out of the house and told Woodard that he could not help him because he had a bad back. Woodard placed the second package in the bed of the pickup truck. With that, Williams got into the van and drove away.

Spencer then got into the pickup truck, along with an unidentified male. Woodard got into the back seat of the Camry, which was being driven by Shedia Glover. Both vehicles began to pull away from the curb. Officer Jackson contacted the APD officers standing by, waiting to raid the residence, and informed them of the vehicles' movement away from the residence. The APD officers commenced the raid, stopping the vehicles in front of the residence.

The officers, led by Detective Benjamin L. Lucas II, were divided into two teams – one entered the residence, one secured its perimeter. Officer Justin Snell, a member of the perimeter team, approached the Camry and arrested and searched Woodard and Glover. On Woodard, he found a Llama 9 mm pistol, loaded, and with a round in the chamber, and $3,856 in bills of various denominations.

The police officers raiding the residence arrested the individuals inside and then searched the residence. They located an ounce of marijuana, a small amount of crack cocaine, a handgun, and $4,000 in bills in a safe. In searching the carport, the officers located five plastic containers that were very similar to the containers in the two packages Inspector Williams had opened. The residence also had a video security system; a camera over the outside of the front door was connected to a small television located inside. Everyone in the residence was arrested, including David Thomas.

Following the raid, Inspector Williams investigated the businesses to which the packages had been addressed. Her investigation revealed that while at least one of these businesses actually existed, neither Woodard nor Spencer were involved with it as owners or employees. The GBI's forensic laboratory subsequently determined that the material contained in the two packages Williams had delivered consisted of fifty pounds of marijuana.

Thomas and Glover implicated Woodard in the marijuana deliveries to the residence in this way. Thomas testified that he had been a regular visitor at the residence for the past year, where he used marijuana and saw people using marijuana and cocaine. He stated that Woodard was present there "a handful" of times, and, when there, Woodard would frequently speak with Spencer.

Glover testified that "a week or two" before the February 3 controlled delivery, Woodard told him that he "had a package, come in or something, and he had wanted me to help him, if I knew anyone who wanted some" and that "if I knew somebody that needed some, you know, help him out and he will hook me up." Glover understood "package" to refer to some type of narcotics and "hook me up" to mean that if he helped Woodard sell the narcotics, Woodard would pay him. Glover said that he had never been to the residence before February 3 and that immediately prior to his arrest, he was in the process of "hand[ing] . . . a bag of money" to Woodard.

B.

Woodard moved the district court for a judgment of acquittal at the close of the Government's case in chief. The court granted his motion as to the Count One offense, conspiracy, but denied it as to Counts Two, possession with intent to distribute, and Five, possession of a firearm in furtherance of a drug trafficking

9

crime. Woodard thereafter put on his defense. It consisted of one exhibit, a certified copy of the firearms permit index of the Clayton County, Georgia, Probate Court. The index showed that Woodard was licensed to carry a firearm at the time of the alleged crimes, February 3, 2003.

After both sides rested, Woodard renewed his motion for judgment of acquittal (as to Counts Two and Five). The court took the motion under advisement, then held a charge conference. The court planned to charge the jury both before and after the parties' closing arguments. The instructions prior to closing argument would cover the substantive law, e.g., the elements of the offenses, the burden of proof, and the jury's duty in determining witness credibility and weighing the evidence. The instructions following closing argument would inform the jury how it should proceed during deliberations.

Woodard requested the court to include the following instruction on "mere presence" (at the scene of the crime) as part of the court's charge on the Count Two offense, possession of marijuana with intent to distribute:

> Of course, mere presence at the scene of a transaction or event or the mere fact that certain persons may have associated with each other does not, standing alone, establish either actual or constructive possession.[12]

---

[12] The Eleventh Circuit pattern jury instruction for a conspiracy charge under 18 U.S.C. § 371 contains the same "mere presence" language requested by Woodard. Eleventh Circuit

10

Woodard also asked the court to instruct the jury on the definition of possession as follows:

> To establish constructive possession, the government must produce evidence showing ownership, dominion, control over the contraband itself or the premises or vehicles in which contraband is concealed. These are basic principles. Even knowledge, approval of, or acquiescence in the acts of someone else without a specific intention to aid and assist that activity is not sufficient to establish actual or constructive possession.

The court agreed to incorporate in a portion of the suggested "mere presence" language but rejected Woodard's proposed definition of possession. The court's instruction to the jury read, in relevant part:

> The defendant is on trial only for those specific offenses alleged in the indictment. I caution you that mere presence at the scene of a crime does not prove any of the elements of a charge in the indictment. . . . The law recognizes several kinds of possession: A person may have actual possession or constructive possession. A person who knowingly has direct physical control of something is then in actual possession of it. A person who is not in actual possession but who has both the power and the intention to later take control over something either alone or together with someone else is in constructive possession of it.

Pattern Jury Instruction, Offense Instruction 13.1 (2003) (stating "[o]f course, mere presence at the scene of a transaction or event or the mere fact that certain persons may have associated with each other does not, standing alone, establish proof of a conspiracy"). There is no "mere presence" language in the Eleventh Circuit pattern jury instruction for a possession with intent to distribute charge. Eleventh Circuit Pattern Jury Instruction, Offense Instruction 85 (2003). The "mere presence" language had been included in the initial draft of the jury instruction, but was then removed when the district court ordered a directed verdict on the conspiracy charge. Woodard was apparently seeking to have the "mere presence" language restored and placed in the instructions on the possession charge.

11

## C.

In arguing Woodard's case to the jury, counsel urged the jury to disregard Glover's testimony as unreliable since it was given pursuant to a plea agreement. Without Glover's testimony, he contended, there was no evidence to indicate that Woodard knew the packages contained marijuana or that he had any intent to distribute marijuana. Woodard had the cash and firearm in his possession, he explained, because he had taken the cash from the bar he owned and needed the firearm for protection in the dangerous neighborhood surrounding the residence.[13] Woodard used the "Tom Smith" alias in signing for the packages, counsel claimed, because it was a dangerous neighborhood and "he [was] being cautious, [and thought] it ain't my packages, it ain't my house, I ain't signing my name." Spencer was the one who was involved in marijuana trafficking; Woodard was simply visiting at Spencer's residence when the police raid occurred – he was, in short, at the wrong place at the wrong time.

The jury retired to consider their verdicts at 3:15 p.m. on the third day of the trial. After deliberating for approximately an hour, the foreperson sent the court a message informing it that "the jury is hung" and asking "do you want us to

---

[13] In his cross-examination of Inspector Williams during the Government's case in chief, counsel brought out that Woodard owned a bar.

12

come back tomorrow?" The court called the jury back into the courtroom and stated "in spite of the fact that you may feel like now you're having some difficulty, I'm going to ask you to come back tomorrow morning and resume your deliberations with a view toward reaching a verdict in the case." The court then dismissed the jury for the evening.

The jury resumed deliberations at 9:30 a.m. the following day. At 10:40 a.m., the foreperson informed the court that "the jury has determined that we will not come to a unanimous decision." The court summoned counsel to its chambers and informed them that it was planning on giving the jurors the Allen charge drawn from the Eleventh Circuit pattern jury instructions, which he had modified to take into account certain criticisms this court made of the pattern Allen charge in United States v. Rey, 811 F.2d 1453, 1458-61 (11th Cir. 1987). Woodard's attorney objected to the use of any Allen charge. The court overruled his objection. Faced with that ruling, the attorney suggested several modifications to the charge, some the court adopted. At 11:05 a.m., the court charged the jury in the language quoted in the margin,[14] and the jury resumed its deliberations at

---

[14] The court instructed the jury as follows:

Your foreperson has indicated, of course, that you're presently unable to reach a unanimous agreement in the case. A jury can certainly disagree on a verdict or disagree as to what the facts of the case may be. However, there should be no disagreement about the law; the law is as I have instructed you. If you have any

13

11:11 a.m. With the exception of an hour for lunch, the jury deliberated until 4:30 p.m., when it returned its verdicts finding Woodard guilty on Counts Two and Five of the indictment. In a motion filed after the trial, Woodard again moved the court for judgment of acquittal. The court denied his motion, and following the imposition of sentence, he took this appeal.

## II.

Woodard contends that the Government failed to establish the Counts Two and Five offenses; therefore, the district court erred in denying his post-verdict motion for judgment of acquittal. We review the district court's ruling de novo.

---

disagreements about the law, please inform me and I will give you additional instructions. If your disagreement concerns the evidence in the case, then only you can resolve that conflict, it if is to be resolved. This is an important case. If you should fail to agree upon a verdict, the case will be left open and may have to be tried again. There is no reason to believe that the case can be tried again by either side any better or more exhaustively than it has been tried before you. When you enter the jury room, it is your duty to consult with one another and to consider each other's views and to discuss the evidence with the objective of reaching a just verdict, if you can do so, without violence to your individual judgment. Each of you must decide the case for yourself, but only after discussion and impartial consideration of the case with your fellow jurors. You should not be advocates for one side or the other. I ask you to reexamine your own personal views in the light of the views of those jurors who disagree with you. You should not hesitate to change your opinion if you are convinced you're wrong, but you should not surrender your honest belief as to the weight and effect of the evidence just because other jurors disagree with you or solely for the purpose of returning a verdict. I'm going to ask you to conduct further deliberations with your best efforts toward reaching a verdict. You may take all of the time that you feel is necessary.

14

United States v. Dulcio, 441 F.3d 1269, 1276 (11th Cir. 2006). We consider the evidence presented to the jury in the light most favorable to the Government, drawing all reasonable inferences and credibility choices in the Government's favor. United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007). We do not require that the evidence compel a verdict of guilty – rather "[b]ecause we recognize that the 'jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial,' our sufficiency review requires only that a guilty verdict be reasonable, not inevitable, based on the evidence presented at trial." Id. (quoting United States v. Starrett, 55 F.3d 1525, 1541 (11th Cir. 1995)).

To make out the Count Two offense under 21 U.S.C. § 841(a)(1), the Government had to establish three elements: "(1) knowledge (of one's possession); (2) possession of a controlled substance; and (3) intent to distribute that substance." United States v. Wilson, 183 F.3d 1291, 1299 n.13 (11th Cir. 1999). These elements may be proven by circumstantial evidence. United States v. Farris, 77 F.3d 391, 395 (11th Cir.1996). "Possession may be actual or constructive, joint or sole." United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004) (per curiam). "A defendant has actual possession of a substance when he has direct physical control over the contraband." United States v. Edwards,

166 F.3d 1362, 1363 (11th Cir. 1999). "A defendant's constructive possession of a substance can be proven by a showing of "ownership or dominion and control over the drugs or over the premises on which the drugs are concealed." United States v. Clay, 355 F.3d 1281, 1284 (11th Cir. 2004).

Woodard contends that while the Government "made out a case that Spencer was likely receiving packages of marijuana and distributing it at his residence," there was no direct evidence that he knew the packages contained marijuana; nor was there any evidence linking the packages referred to in his conversation with Glover to the packages delivered at the residence. His mere presence at the residence, he argues, in conjunction with "sign[ing] for an innocuous package at the request of the postal handler," was insufficient to support his conviction. See United States v. Maspero, 496 F.2d 1354, 1359 (5th Cir. 1974) ("[M]ere presence in the area of contraband or awareness of its location is not sufficient to establish possession.").[15]

We conclude, however, that the Government provided sufficient evidence on all three elements of § 814(a)(1) to support the jury's verdict. There was extensive circumstantial evidence that Woodard knew the packages contained

---

[15] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this Court accepted as binding precedent all Fifth Circuit cases decided before October 1, 1981.

marijuana. Woodard had visited the residence at least several times prior to the delivery, and the jury could reasonably infer that the residence was a site of illegal drug use and distribution, as evidenced by Thomas's testimony, the drugs found at the residence, and Spencer's use of the residence as a receiving point for the packages. Woodard frequently spoke with Spencer while at the residence, and Spencer had signed for all five of the previously sent packages. Woodard was waiting at the residence on the date that King had told the unidentified caller the packages would be delivered and he signed for the packages with a false name. Once the packages had arrived and Woodard moved the first package, he called out for Spencer to help him move the second package, from which the jury could infer that Woodard was alerting Spencer to the arrival of the narcotics. Woodard immediately moved the packages into the nearby GMC truck. He did not ask Spencer, the owner of the residence, for instructions as to where to place the packages, which, the jury could have assumed, would have been what an individual ignorant of their contents would have done. Woodard, along with Spencer, attempted to leave the residence immediately after transferring the packages into the truck.

In addition, Woodard had told Glover that he was expecting a package of illegal drugs to arrive and there was sufficient evidence for the jury to conclude

17

that Woodard was referring to the same packages that were delivered on February 3.[16] Glover testified that he had never been to the residence before he met with Woodard there on February 3, when the packages were expected to arrive, and that when he was arrested he was in the process of handing a bag of money to Woodard. From these facts, the jury could have reasonably inferred that Glover was there to purchase the contents of the packages discussed in their earlier conversation.

Woodard had both actual and constructive possession of the marijuana. Woodard signed for the packages, despite not living at the residence, decided where the packages should go, and then moved the packages into the truck, thus demonstrating actual possession. See United States v. Jones 676 F.2d 327, 332 (8th Cir. 1982) (holding that evidence was sufficient to show actual possession of marijuana when defendant received bales of marijuana and then loaded bales into a van); United States v. Glitlitz, 368 F.2d 501, 505 (2d Cir. 1966) (holding that appellant's taking delivery of footlockers containing narcotics and obtaining

---

[16] Although Glover's testimony is not perfectly clear as to whether the packages had come in, or were expected to come in, Woodard concedes, in his brief to this court, that "Mr. Glover testified that he was informed that Mr. Woodard was expecting a package," and the jury could have reasonably understood his testimony to have this meaning.

storage space for footlockers sufficient to show actual possession).[17]  As Glover

testified, Woodard planned to sell the marijuana once it had arrived, indicating

that Woodard had control over the narcotics sufficient to establish constructive

possession.  Turning to the third element of § 814(a)(1), Glover's testimony and

the large amount of marijuana in the packages were sufficient to establish that

Woodard intended to distribute the marijuana.  See United States v. Vomero, 567

F.2d 1315, 1316 (5th Cir. 1978) ("Moreover, possession of a large quantity of

narcotics supports the inference that distribution was intended.").

We also conclude that the evidence was sufficient to establish that

Woodard violated 18 U.S.C. § 924(c).  To prove the Count Five offense, the

Government had to establish that Woodard (1) knowingly (2) possessed a firearm

(3) in furtherance of any drug trafficking crime for which he could be prosecuted

in a court of the United States.[18]  18 U.S.C. § 924(c)(1)(A).  The "in furtherance"

element requires proof that "the firearm helped, furthered, promoted, or advanced

the drug trafficking."  United States v. Timmons, 283 F.3d 1246, 1252 (11th Cir.

---

[17] Woodard's exercise of control over the packages – he signed for them and moved them to the nearby truck – is sufficient to distinguish this case from United States v. Edwards, 166 F.3d 1362, 1364 (11th Cir. 1999), where we held that "mere inspection" of a package of narcotics was not sufficient to constitute actual possession.

[18] 18 U.S.C. § 924(c) also prohibits the use or carrying of a firearm "during and in relation to any crime of violence or drug trafficking crime."  Woodard was not indicted under this aspect of § 924(c).

2002).  We consider several factors in determining whether a defendant possessed a firearm "in furtherance" of a drug trafficking crime such as:

> The type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to the drugs or drug profits, and the time and circumstances under which the gun is found.

Id. at 1253 (quoting United States v. Ceballos-Torres, 218 F.3d 409, 414-15 (5th Cir. 2000)).

There is no dispute that Woodard knowingly possessed a firearm. Woodard contends that he did not use this firearm in furtherance of a drug trafficking crime because he had a license for the Llama pistol and a plausible reason to be carrying it – the neighborhood around the residence was dangerous – which was unconnected to any drug trafficking crime.  Woodard's argument, though, fails to demonstrate that the guilty verdict was not reasonable.  Woodard had a loaded pistol, with a round in its chamber, in his waistband – he had easy access to the pistol and it was ready to be used – while taking delivery of packages containing roughly one hundred pounds of marijuana, an amount worth a considerable sum of money.  On these facts, a reasonable jury could infer that Woodard had the pistol to use as protection for the valuable shipment of marijuana which he expected to arrive at the residence on February 3 and thereby conclude that

20

Woodard possessed the firearm "in furtherance" of his planned sale of the marijuana. See United States v. Miranda 425 F.3d 953, 962 (11th Cir. 2005) (when firearms were found in apartment near narcotics, holding that "reasonable jury could infer that the purpose of firearms . . . was to provide defense or deterrence in furtherance of the drug trafficking for which defendant was arrested") (quotation omitted); United States v. Lawrence, 308 F.3d 623, 630 (6th Cir. 2002) (when firearms were found loaded and located "in close proximity" to the drugs, "holding that [i]t was quite reasonable for the jury to concluded that the weapons were placed strategically so that [the defendant] could defend his drugs . . . thus satisfying the "in furtherance of" requirement of § 924(c)").

In sum, we hold that the evidence was sufficient to convict Woodard of the offenses at issue; hence, the court committed no error in denying his motion for judgment of acquittal. We turn, now, to his claim that he is entitled to a new trial.

**III.**

A.

Woodard's first argument for a new trial is centered on Detective Lucas's testimony during the Government's case in chief. Lucas testified that he had briefly interviewed Woodard, immediately after his arrest, while the police were still at the residence. The prosecutor asked: "What did [Woodard] tell you during

this interview?" Lucas replied: "He gave me his name, his date of birth, he produced, I believe, it was a driver's license, a photo ID, stated that he was there visiting Mr. Spencer and that was basically it. He gave no reason for having a weapon that was found on him." Woodard's counsel moved immediately for a mistrial on the ground that the Government had not notified him, as required by Fed. R. Crim. P. 16(a)(1)(A),[19] that it intended to use any of the statements that Woodard had made to the police and, moreover, that Lucas's answer was unresponsive to the question he had been asked.[20] The judge denied the motion, but instructed the jury that "some of the responses of this witness to the question were unresponsive to the question and you should disregard his response of

---

[19] Fed. R. Crim. P. 16(a)(1) provides:

Upon a defendant's request, the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial.

[20] When counsel moved for a mistrial, the court convened a sidebar conference, which was not reported. After the Government rested its case in chief, and the jury was in recess, the district court placed the contents of Woodard's motion on the record. Woodard's counsel then further explained his objection, stating as follows:

Because this officer was qualified as a . . . very experienced officer of many years. . . I believe he deliberately responded in that fashion, knowing that or thinking that it would help the government's case, and because he is a professional, because he is a professional witness, that deliberate elicitation by this particular witness to a non-responsive question deserves a mistrial, some kind of sanction from the Court or some other curative – well, a more curative enforcement, than, gee, just disregard that, because as we all know, you can't un-ring the bell, so that's my position.

22

anything he said over and above the fact that the defendant told him that he was there to visit Mr. Spencer."

Woodard now contends that the Government improperly commented on his post-Miranda silence by eliciting Lucas's statement that Woodard "gave no reason for having the weapon that was found on him," thereby transgressing the Fifth Amendment. See Miranda v. Arizona, 384 U.S. 436, 468 n.37, 86 S. Ct. 1602, 1624 n.37, 16 L. Ed. 2d 694 (1966). Woodard failed to present this argument to the district court;[21] we therefore review his challenge to Lucas's statement for plain error. United States v. Anderson, 782 F.2d 908, 915 (11th Cir. 1986).[22] We find none here. Prior to the trial, the district court held a hearing, pursuant to Jackson v. Denno, 378 U.S. 368, 376-77, 84 S. Ct. 1774, 1780-81, 12 L. Ed. 2d 908 (1964), to determine the admissibility of any statements Woodard, Glover, Spencer, or Thomas made to Detective Lucas on February 3 at the residence. The court found that the defendants freely and voluntarily waived

---

[21] As indicated, supra, Woodard's motion for a mistrial was based on the Government's failure to provide notice under Fed. R. Crim. P. 16(a)(1)(a) of the prosecutor's intent to make use of any statements Woodard had given the police and the notion that Lucas's answer was unresponsive to the question.

[22] Under plain error review, the defendant must establish "(1) error (2) that is plain and (3) that affects [his] substantial rights." United States v. Monroe, 353 F.3d 1346, 1349 (11th Cir. 2003) (quotation omitted).

their right to remain silent before speaking to Lucas;[23] consequently, Woodard's challenge is baseless.

B.

Woodard argues that the district court abused its discretion in giving the jury its modified <u>Allen</u> charge. We [will] find that a district court has abused its discretion in giving a modified <u>Allen</u> charge only if the charge was inherently coercive. <u>United States v. Chigbo</u>, 38 F.3d 543, 545 (11th Cir. 1994); <u>United States v. Bass</u>, 490 F.2d 846, 855 (5th Cir. 1974). In assessing whether the charge was coercive, we consider the language of the charge and the totality of the circumstances under which it was delivered, e.g., whether the court conducted a full poll of the jury before giving the charge and the amount of time between the delivery of the charge and the return of the jury's verdict. <u>See</u> <u>Chigbo</u>, 38 F.3d at 545; <u>United States v. Rey</u>, 811 F.2d 1453, 1460 (11th Cir. 1987).

We have approved the use of the Eleventh Circuit pattern <u>Allen</u> charge on numerous occasions. <u>See, e.g.,</u> <u>United States v. Dickerson</u>, 248 F.3d 1036, 1050 (11th Cir. 2001); <u>United States v. Trujillo</u>, 146 F.3d 838, 846 (11th Cir. 1998). The district court modified the pattern instruction, but only to take into account suggestions by defense counsel and the criticisms of the instruction this court

---

[23] Woodard raises no challenge to the district court's determination on appeal.

24

made in Rey, 811 F.2d at 1459-61 (11th Cir. 1987). The Rey panel held that precedent required it to uphold the district court's use of the pattern charge, but criticized several portions of its language as "tend[ing] to coerce the jury into reaching a verdict." Id. at 1459. The district court deleted the portions of the instruction criticized in the Rey decision. We see no error in the modifications made by the district court – indeed, the court's attention to the concerns we expressed in Rey is commendable.

Nothing in the circumstances surrounding the court's reading of the Allen charge appears remotely coercive. When the jury first informed the court that it was deadlocked, the court asked the jury to resume its deliberations the following day and dismissed it for the evening. Only after the jury informed the court for the second time that it was deadlocked did the court give the Allen charge; and the court did not poll the jury before giving the charge. The jury then deliberated for approximately four more hours before returning its verdicts, twice as long as they had deliberated before receiving the instruction. We find no abuse of discretion under these circumstances.

C.

Woodard argues that the district court erred in not giving in full his requested instruction on mere presence – his theory of defense being that he just

25

happened to be present when the packages of marijuana were delivered. We review a district court's refusal to give a defendant's requested theory-of-the-defense instruction for an abuse of discretion. United States v. Arias-Izquierdo, 449 F.3d 1168, 1186 (11th Cir. 2006). A district court abuses its discretion in failing to give a requested instruction if

> (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by the charge actually given, and (3) its subject matter dealt with an issue in the trial court that was so important that the failure to give it seriously impaired the defendant's ability to defend himself.

United States v. Paradies, 98 F.3d 1266, 1287 (11th Cir. 1996).

We find no abuse of discretion in the district court's refusal to give verbatim the instruction Woodard requested. The instruction the court gave substantially covered the one Woodard proposed. As an initial matter, we note that the court gave the bulk of the proposed instruction. In addition, it charged the jury that to convict Woodard on Count Two, it had to find that he "knowingly and willfully possessed the drugs" and that he "possessed said drugs with the intent to distribute them." The court defined knowingly as meaning "the act was done voluntarily and intentionally and not because of mistake or accident"; it defined willfully as "the act was committed voluntarily and purposefully, with the specific intent to do something the law forbids." Having received these

26

instructions, "the jury could not have attributed possession to [the defendant] through his mere presence alone, because mere presence would not establish voluntary [and] intentional possession." United States v. Ferguson, 212 F. App'x 873, 877 (11th Cir. 2006); see United States v. Rojas, 537 F.2d 216, 220 (5th Cir. 1976) (holding that a charge stating "that in order to find possession, the jury must find that the defendant had either direct physical control or the power and intention to exercise dominion or control over the cocaine" was sufficient to "preclude conviction for mere presence or proximity").

Woodard contends that the court's "charge on the law of possession reduced the burden of proof on the government," in violation of his right to due process, because it did not require the Government to produce evidence showing "ownership, dominion, or control over the contraband itself" to establish his constructive possession of the marijuana.

Woodard's argument assumes that the phrase "ownership, dominion, and control" sets a higher standard for proof than the court's instruction, which required the Government to show that he had "both the power and intention to later take control" of the marijuana to prove constructive possession. This assumption is wrong – we have used the phrases interchangeably in defining constructive possession. See United States v. Gunn, 369 F.3d 1229, 1235 (11th

27

Cir. 2004) ("A defendant has constructive possession if he exercises ownership, dominion, or control over the firearm. A defendant <u>also</u> has constructive possession if he has the power and intention to exercise dominion or control.") (citation omitted) (emphasis added). Moreover, the court's instruction on possession, which was taken in full from the Eleventh Circuit Pattern Jury Instructions manual, has already been affirmed by a panel of this court over the same objection Woodard now makes. <u>United States v. Hastamorir</u>, 881 F.2d 1551, 1559 (11th Cir. 1989).

## IV.

For the foregoing reasons, Woodard's convictions are

**AFFIRMED.**