[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-12647

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

EMMANUEL YOUNGBLOOD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:24-cr-00042-ECM-KFP-1

_____

Before ROSENBAUM, JILL PRYOR, and BRASHER, Circuit Judges.

PER CURIAM:

Emmanual Youngblood appeals his conviction and sentence for possession with intent to distribute fifty grams or more of meth-amphetamine. First, Youngblood argues that the district court erred in denying his motion for judgment of acquittal. He asserts that the evidence at trial was insufficient to support the knowledge element his offense under 21 U.S.C. § 841(a)(1). Second, he contends that his sentence—210 months' imprisonment—was substantively unreasonable. Youngblood urges that the district court failed to afford appropriate weight to an alleged sentencing-disparity issue, and that the court placed too much weight on the nature of his offense and his history and characteristics.

After careful consideration, we conclude that the evidence was sufficient to convict Youngblood of the offense. And the district court did not commit a clear error of judgment in sentencing him to 210 months' imprisonment, either. So we affirm.

## I.    BACKGROUND

Emmanual Youngblood was charged with one count of possession with intent to distribute fifty grams or more of metham-phetamine, in violation of 21 U.S.C. § 841(a)(1). He pled not guilty and invoked his right to trial by jury.

## A. Evidence at Trial

At the jury trial, Sergeant Eric Ernsberger testified that on November 23, 2022, he attempted to stop Youngblood in his vehicle, knowing that Youngblood had an outstanding warrant. But after Ernsberger and his partner, Sergeant Chase Avant, turned on the police car's lights and sirens, Youngblood fled. Youngblood reached a speed of 70 mph in a 25-mph residential area, at one point running a stop sign. When Ernsberger realized a child was in the back of Youngblood's car, he ended the pursuit. According to Ernsberger, at that point, Youngblood "slammed" the car's breaks, jumped out, and fled on foot.

Avant pursued Youngblood in a foot chase, while Ernsberger approached the vehicle. Avant testified that Youngblood ran for about 200 yards before he finally stopped and complied with Avant's commands. Avant arrested Youngblood and took him into custody.

Meanwhile, Ernsberger approached the vehicle Youngblood had leapt out of.[1] Ernsberger testified that as he got closer, he saw that a woman had "jumped in the driver's seat" from the passenger's seat. This was Tyquandra McNair, Youngblood's girlfriend and coparent. The motor revved and McNair attempted to flee. Ernsberger drew his firearm and ordered her to put the car into park. She did. Then he removed McNair from the car and told her to tend to the four children riding with her—all of whom were in

---

[1] The jury viewed Ernsberger's body-camera footage at trial.

car seats. Ernsberger estimated that the children were quite young, all "[p]ossibly five and below." Ernsberger testified that he didn't handcuff McNair because she was pregnant and children were present, although he agreed when asked whether he "suspected her, at least initially, of being involved in a crime[.]"

By this point, Avant had returned to the car to assist Ernsberger. Avant read McNair her *Miranda* rights. McNair was placed under arrest, which Avant said was "for hindering prosecution[.]" Next, Avant went looking for any items Youngblood may have dropped or tossed while he was fleeing. But he didn't find anything. So Avant again returned to the vehicle, at which point McNair's mother had arrived to take custody of the children. Once the children were removed, the officers searched the back of the car.

Ernsberger testified that he smelled a "strong odor of marijuana" inside. So he searched the car, finding a brown Gucci bag "directly behind the center console, in between the driver and the passenger seat." The bag contained a grinder with marijuana, a set of digital scales, plastic bags, a small bag of cocaine, and an oxycodone pill. In addition, in the front passenger area, Ernsberger found a backpack containing water, children's snacks, and medication. In the same area, Ernsberger also found a black purse with McNair's identification in it. Neither the backpack nor the purse had any drugs in them.

When police officers later searched the car's "far back," they discovered taped-up "bundles" that contained a vacuum-sealed bag

of "green plant material," in Ernsberger's words.  They also found two vacuum-sealed TV dinner boxes—one of which contained methamphetamine; the other, marijuana.  The methamphetamine was divided up into nineteen individual baggies, each weighing about one ounce.  According to Avant, police recovered a backpack full of men's clothing near the bags of marijuana in the back of the car.  Ernsberger similarly testified that the men's clothing was in the back of the car near the methamphetamine.  Another bag in the back of the car held children's shoes and a pair of flip flops.

The government admitted limited forensic evidence at trial. Law enforcement did not test one of the TV dinner boxes (the one containing the methamphetamine) for fingerprints, and they later discarded it.  They tested the other (containing the marijuana), but couldn't recover any usable fingerprints from it.  Avant testified that in his experience, getting usable fingerprints from an item like that wasn't common.  The record contained no DNA evidence, either.  Nor did the government present any evidence from the cell phones at the scene, only one of which was seized.  The officers did not seize either of McNair's two cell phones.  A forensic chemist for the Drug Enforcement Administration testified that the contents of nineteen plastic bags recovered from the vehicle contained 532 grams of 100% pure methamphetamine.

Avant testified that at the time, that amount of methamphetamine was worth about $5,700 on the street.  He added that a typical personal-use amount is about one to three grams.  He also testified that he'd previously arrested Youngblood in June of 2020.  He

did so after a traffic stop, where Youngblood was the vehicle's sole occupant.  In searching the vehicle on that occasion, police found a black Gucci bag containing marijuana, a digital scale, multiple empty individual plastic bags, and a notebook with a ledger of names and dollar amounts—consistent with narcotics distribution. Avant stated that, in connection with that offense, Youngblood was found guilty of possessing marijuana "for more than personal use."

Avant said that the plastic bags in the car in this case's 2023 incident were similar to the ones the police found in Youngblood's car back in 2020.  And in Avant's view, it was odd for Youngblood to flee this time based on the small amount of drugs in the Gucci bag alone.  Avant added that it's common for drug dealers to rent vehicles to transport narcotics in an effort to evade law enforcement's detection.  It turned out that Youngblood's mother had rented the car about three hours before the traffic stop.

Police later interviewed McNair, who denied any knowledge of the methamphetamine.  The police did not pursue an investigation to determine her potential involvement any further.

## B.  Motions for Acquittal

After the government rested, Youngblood moved for an acquittal under Rule 29 of the Federal Rules of Criminal Procedure. Defense counsel argued that the government failed to provide sufficient evidence to convict him because even though law enforcement found the methamphetamine in the car, there was "no evidence" (in his view) that Youngblood knowingly possessed it.

24-12647                Opinion of the Court                7

According to the defense, "[t]he only evidence . . . [was] that he ran from the van."  And the defense pointed out that McNair moved into the driver's seat and attempted to flee the scene—contending that for all we know, the methamphetamine could have been hers.

The government responded that, in its view, the evidence was sufficient to show Youngblood's knowledge of the metham-phetamine.  It pointed out that Youngblood drove the vehicle; that his mother had rented it just three hours before; and that he fled the scene at a high rate of speed, "putting his own children . . . at risk," and then he led the officers on a foot chase—all indicative of "consciousness of guilt."  The government added that Youngblood had the prior conviction, in 2020, for possessing drugs in a vehicle with intent to distribute; and that the drugs here were discovered next to male clothing, and Youngblood was the only adult man in the car.  As for McNair's potential involvement, the government argued that that was "not relevant," because Youngblood could be found guilty even if he possessed the drugs jointly with McNair.

The district court agreed with the government, denying Youngblood's motion for acquittal.  The court pointed to the facts that Youngblood was driving, that his mother rented the car, that the drugs were found near an adult man's clothing, and that the 2020 conviction presented evidence of "prior similar acts"—all of which together was "sufficient to present this case to the jury."

Next, Youngblood's mother took the stand.  She testified that she'd rented the car for Youngblood and his girlfriend, McNair,

because they had plans to travel to see McNair's family for Thanksgiving.

The defense rested. Youngblood then renewed his Rule 29 motion, adding that Youngblood's mother's testimony further supported a judgment of acquittal. The government urged the court to deny the motion for the same reasons as before. The district court did so, for the same reasons the government pointed to earlier—finding that Youngblood's mother's testimony didn't change the court's analysis.

### C. Verdict and Sentencing

The jury found Youngblood guilty.

The probation officer's presentence investigation report ("PSI") determined that Youngblood's base offense level was 34, given the weight of the drugs (more than 10,000 kg, but less than 30,000 kg). Probation did not recommend any adjustments or enhancements, so it set Youngblood's total offense level as 34. Because he had five criminal-history points, the probation officer calculated Youngblood's criminal-history category as a III. This was based on a 2008 arrest and 2014 conviction for manslaughter, a 2016 arrest and 2017 conviction for harassment, and a 2022 arrest and conviction for domestic violence. Youngblood also had pending charges pertaining to two arrests in 2022 for possessing drugs (one, marijuana; the other, hydrocodone pills).

The probation officer calculated Youngblood's Sentencing Guidelines range as 188 months to 235 months of imprisonment— or approximately 16 to 20 years. The statutory mandatory

minimum was ten years, and the maximum term was life imprisonment. *See* 21 U.S.C. § 841(a)(1), (b)(1)(A). And the Guidelines term of supervised release was five years. *See* 21 U.S.C. § 841(b)(1)(A); U.S.S.G. § 5D1.2(c).

The government recommended a 235-month sentence, given Youngblood's dangerous conduct in initiating a high-speed chase with children in the car, and his "violent criminal history." Youngblood requested a 120-month sentence, arguing that a downward adjustment was warranted under U.S.S.G. § 5G1.3(b). That is to say, he sought credit for time served in state custody for relevant conduct. *See* U.S.S.G. § 5G1.3(b). He also argued that his Guidelines range overemphasized the importance of drug purity, and that the practice of testing for purity varied across jurisdictions—producing unwarranted sentencing disparities. Additionally, he pointed to a report from a licensed psychologist attesting to his challenging and traumatic upbringing. So he requested a downward variance based on the Section 3553(a) factors.

In response, the government argued that Section 5G1.3(b) did not apply because Youngblood had already discharged his prior state sentence. It contended that other courts have rejected the same argument about the methamphetamine-purity issue. And it argued that Youngblood's "childhood experiences" didn't warrant a downward variance given the seriousness of the offense. So it asked the court to decline to impose either a downward adjustment or a downward variance.

At the sentencing hearing, the district court adopted the PSI's Sentencing Guidelines calculations, which the parties agreed were correctly calculated. Youngblood renewed his requests for a downward departure under Section 5G1.3(b) or Section 5K2.23,[2] or a downward variance based on the Section 3553(a) factors. As to the request for a downward variance, he asserted that his Guidelines range would have been 121 to 151 months if he were prosecuted in a jurisdiction that didn't regularly test the purity of the methamphetamine. The government again requested a 235-month sentence, with no adjustment for time served nor any downward variance. The government pointed to Youngblood's "violent" criminal history and the circumstances of the offense as weighty considerations.

After hearing from the parties, the court denied Youngblood's request for a downward variance or departure. The court rejected this both on the ground of the discharged state term of imprisonment, and on the drug-purity issue. It explained that Section 5K2.23, not Section 5G1.3(b), would potentially apply, given that Youngblood's term of state incarceration was already

---

[2] As we've explained, U.S.S.G. "5G1.3(b) *requires* the district court to 'adjust' a defendant's sentence to credit him for time served in state custody on relevant conduct covered by his federal sentence—but only when the defendant has undischarged time remaining on his state sentence. Meanwhile, U.S.S.G. § 5K2.23 *allows* a district court to exercise discretion to 'depart[]' from a guidelines sentence to reflect credit for time served in state custody on relevant conduct covered by his federal sentence when the related state sentence is completely discharged at the time of federal sentencing." *United States v. Gonzalez-Murillo*, 852 F.3d 1329, 1331 (11th Cir. 2017) (emphases in original).

discharged.  But here, the court found any departure unwarranted.  It also rejected Youngblood's request for a variance based on the purity issue, given the "very strong" public-safety rationale for punishing high-purity methamphetamine trafficking.

So the district court sentenced Youngblood to 210 months of imprisonment, followed by a five-year term of supervised release.  It explained that it reached this figure after considering the Section 3553(a) factors.  The court emphasized how "serious" Youngblood's conduct was, and that the "circumstances" of the offense were "reprehensible," given that he engaged the police in a high-speed chase with children and a pregnant woman in the car.  And it pointed to the large quantity of pure methamphetamine, which "has a devastating effect on people and communities."  The court also referred to Youngblood's "very concerning criminal history," which involved both "threats" and "acts of violence."  As for the psychologist's report, the district court emphasized that it showed Youngblood had scored highly in nonverbal reasoning and exerting mental control—which the court took to mean he had the power to change his own future.  The court urged Youngblood to do just that.

Youngblood objected to his sentence as both procedurally and substantively unreasonable.  The court indicated that, even if it had sustained Youngblood's objection on the Section 5G1.3 issue, it still would've varied upward to the 210-month sentence.  And it said it expressly factored in the "period of incarceration that [Youngblood would] not get credit for," too.  The court overruled

Youngblood's objection, stating that it had viewed the evidence at trial, and it considered the conduct here to be "particularly egregious[.]" So the district court's 210-month sentence stood.

Youngblood timely appealed. On appeal, he first argues that the evidence was insufficient to support the *mens rea* element of the offense. Second, he contends that his sentence was substantively unreasonable.

## II.    DISCUSSION

We begin by explaining why the evidence was sufficient to support Youngblood's conviction. Then we explain why his sentence was substantively reasonable.

### A.  *The evidence was sufficient to support Youngblood's conviction.*

We review *de novo* the district court's denial of Youngblood's motion for judgment of acquittal on insufficient-evidence grounds. *United States v. Yates*, 438 F.3d 1307, 1311–12 (11th Cir. 2006) (en banc). And we review *de novo* the sufficiency of evidence to support a conviction, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007).

We will not vacate a conviction merely where the defendant "'put forth a reasonable hypothesis of innocence,' because 'the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt.'" *United States v. Campo*, 840 F.3d 1249, 1258 (11th Cir. 2016)

24-12647                Opinion of the Court                13

(quoting *United States v. Beckles*, 565 F.3d 832, 840 (11th Cir. 2009)). Thus, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990).

To convict Youngblood of a 21 U.S.C. § 841(a)(1) offense, the Government had to prove "three elements:  '(1) knowledge (of one's possession); (2) possession of a controlled substance; and (3) intent to distribute that substance.'"  *United States v. Woodard*, 531 F.3d 1352, 1360 (11th Cir. 2008) (citation omitted).[3]  The government may prove these elements by circumstantial evidence, *id.*, and the same standard applies "whether the evidence is direct or circumstantial," *Young*, 906 F.2d at 619.  But when the government relies on circumstantial evidence to support a conviction, "reasonable inferences, not mere speculation, must support" it.  *United States v. Mendez*, 528 F.3d 811, 814 (11th Cir. 2008).

To prove knowledge, "[e]vidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt."  *United States v. Blakey*, 960 F.2d 996, 1000 (11th Cir. 1992).  But evidence of flight is not necessarily dispositive.  *See United States v. Louis*, 861 F.3d 1330, 1334 (11th Cir. 2017).  Rather, the question is whether

---

[3] *See also* 21 U.S.C. § 841(a)(1) ("[I]t shall be unlawful for any person knowingly or intentionally – (1) to manufacture, distribute, or dispense, or possess with the intent to manufacture, distribute, or dispense, a controlled substance . . . .").

the evidence—direct, circumstantial, or both—was "strong enough to prove beyond a reasonable doubt" that the defendant knowingly possessed the controlled substance. *See id.*

On the second element, the possession can be either actual or constructive, and either joint or sole. *Woodard*, 531 F.3d at 1360. The government can prove constructive possession by showing that the defendant exercised "ownership or dominion and control over the drugs or over the premises on which the drugs are concealed." *Id.* (citation and internal quotation marks omitted).

And on intent, "possession of a large quantity of narcotics supports the inference that distribution was intended." *United States v. Vomero*, 567 F.2d 1315, 1316 (5th Cir. 1978).[4] Plus, the jury can weigh evidence that the defendant had a prior drug-trafficking conviction "against any inference that [the defendant] had no knowledge of the drugs in his car or lacked the intent to possess and distribute them." *See United States v. Barron-Soto*, 820 F.3d 409, 419 (11th Cir. 2016).

Here, Youngblood argues that the evidence was insufficient to support the knowledge element. In short, he contends that it was "equally if not more likely" that McNair, not he, possessed the methamphetamine. And he points out that there wasn't any forensic evidence directly linking him to the drugs. So he argues that the

---

[4] Fifth Circuit decisions issued by the close of business on September 30, 1981, are binding on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

court sentenced him based on only "circumstantial evidence and inference," and that the evidence was insufficient to establish that Youngblood knowingly possessed methamphetamine with intent to distribute.

These arguments are unavailing. In viewing the evidence in the light most favorable to the government, as we must on a guilty verdict, a rational trier of fact could have concluded beyond a reasonable doubt that Youngblood knowingly possessed the methamphetamine. *See Young*, 906 F.2d at 618. The "*any* rational trier of fact" standard is a low one. *See United States v. Trujillo*, 146 F.3d 838, 845 (11th Cir. 1998) (emphasis in original). And this case clears that bar.

The evidence at trial established that Youngblood was driving the vehicle and fled when police tried to stop him. He led the police in a high-speed chase, and then a pursuit on foot. Sergeant Avant stated that it was odd for Youngblood to do so, had he known only about the small quantities of drugs in the Gucci bag up front. Youngblood's behavior here was probative of culpability. *See Blakey*, 960 F.2d 1000; *Louis*, 861 F.3d at 1334. And though the outstanding warrant may have separately triggered Youngblood's flight, that was an alternative explanation that the jury was free to reject.

Besides that evidence, Youngblood's mother had rented the car just a few hours before his arrest. Men's clothing was found near the methamphetamine in the rear of that car, and Youngblood was the only man in the car. Youngblood even had a prior

conviction for drug trafficking involving a vehicle.  And in the earlier case, Youngblood was the vehicle's sole occupant.  There, like here, police uncovered narcotics, scales, individual plastic bags, and a ledger in the vehicle.  The jury could reasonably conclude that this evidence, too, supported a finding of knowledge and intent. *See Barron-Soto*, 820 F.3d 409, 419.

When it comes to the evidence pointing to McNair's possible involvement, that doesn't negate the weighty evidence of Youngblood's guilt, either.  After all, they could have possessed the drugs jointly.  *See Woodard*, 531 F.3d at 1360.  And the jury was free to reject the inference that the drugs were McNair's alone.  *See Taylor*, 480 F.3d at 1026.  Evidently, it did.  Even if Youngblood put forward a reasonable alternative theory of liability, that would not be grounds for vacating his conviction.  *Campo*, 840 F.3d at 1258; *Young*, 906 F.2d at 618.

Taken together, the evidence in this case permitted a reasonable jury to conclude that Youngblood knowingly possessed the methamphetamine with intent to distribute.  His conviction was supported by "reasonable inferences, not mere speculation . . . ." *Mendez*, 528 F.3d at 814.  So the district court didn't err in denying Youngblood's motion for an acquittal, and we won't vacate the conviction.

### B. *Youngblood's sentence is substantively reasonable.*

We review the substantive reasonableness of a sentence for abuse of discretion.  *United States v. Irey*, 612 F.3d 1160, 1188–89 (11th Cir. 2010) (en banc).  "That familiar standard 'allows a range

of choice for the district court, so long as that choice does not constitute a clear error of judgment.'" *Id.* at 1189 (quoting *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc)). And the burden falls on the party challenging the sentence to prove that it's "unreasonable in light of the entire record, the § 3553(a) factors, and the substantial deference afforded sentencing courts." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015).

Abuse of discretion occurs when a district court "(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Irey*, 612 F.3d at 1189 ((quoting *United States v. Campa*, 459 F.3d 1121, 1174 (11th Cir. 2006) (en banc)). Though district courts have discretion in sentencing, "that [discretionary] zone is neither limitless nor impervious to review." *Id.* at 1191 n.16. We may vacate the sentence if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the [18 U.S.C.] § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 1190 (quoting *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008)).

Section 3553(a) provides that the "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in Section 3553(a)(2). 18 U.S.C. § 3553(a). Those purposes include the need for the sentence to reflect the offense's seriousness, and to provide just punishment for it; to

provide adequate deterrence; to protect the public from any future crimes of the defendant; and to provide the defendant with adequate training or correctional treatment. *Id.* § 3553(a)(2). The other factors in Section 3553(a) that the court must consider include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentence and sentencing range set forth by the Sentencing Guidelines, and the need to avoid unwarranted sentence disparities among similarly situated defendants. *Id.* § 3553(a).

The district court must evaluate all the Section 3553(a) factors, but the weight given to each factor is within "the sound discretion of the district court." *United States v. Ramirez-Gonzalez*, 755 F.3d 1267, 1272–73 (11th Cir. 2014) (per curiam) (citation and internal quotation marks omitted). In considering whether a particular sentence imposed is reasonable, we must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range," *Gall v. United States*, 552 U.S. 38, 51 (2007), which "is surely relevant" to the reasonableness inquiry, *id.* at 41.

The district court did not abuse its discretion in sentencing Youngblood to 210 months of imprisonment based on the facts of this case. That's because the district court didn't fail to give appropriate weight to any of the relevant factors, nor did the district court commit any clear errors of judgment in weighing the statutory factors. *See Irey*, 612 F.3d at 1189.

Youngblood's arguments to the contrary are unconvincing.

First, Youngblood looks to Sections 5G1.3(b) and 5K2.23 of the Sentencing Guidelines in arguing that a downward departure was warranted. But as Youngblood acknowledges, "we lack jurisdiction to review the decision of the district court not to apply a downward departure." *United States v. Winingear*, 422 F.3d 1241, 1245 (11th Cir. 2005). And insofar as Youngblood contends that the district court failed to give "significant weight" to the state-term-of-custody issue in weighing the 3553(a) factors, we observe at the outset that the district court *did* consider the state imprisonment term in deciding Youngblood's sentence. And in balancing this consideration among the Section 3553(a) factors generally, we can't say the district court committed a clear error of judgment in arriving at a 210-month sentence. *See Irey*, 612 F.3d at 1189.

Second, Youngblood contends that the district court erred in putting too much weight on the first Section 3553(a) factor—specifically, the fact that the offense involved fleeing the police. But as we've repeatedly stated, "the weight to be accorded to each § 3553(a) factor" is "commit[ed] to the sound discretion of the district court[.]" *United States v. Perkins*, 787 F.3d 1329, 1342 (11th Cir. 2015); *accord United States v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007). And this wasn't just any flight—Youngblood led the police on a high-speed chase with four children, seemingly under the age of five, in the car, plus his pregnant girlfriend.

Third, Youngblood argues that the court should've given "significant weight" to the alleged interjurisdictional variation in testing for drug purity. But again, the district court did not clearly

err.  The court did appear to consider the sentencing-disparity issue generally; it just found Youngblood's argument not very compelling given the facts of this case.  *See United States v. Williams*, 526 F.3d 1312, 1322–23 (11th Cir. 2008) (noting that the district court is "not required to discuss each factor" specifically, and explaining that the court may attach greater weight to one factor more than another in sentencing).

Finally, Youngblood argues that the 210-month sentence was greater than necessary to achieve the goals laid out in Section 3553(a).  But we cannot find that this sentence "lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (quoting *Pugh*, 515 F.3d at 1191).

In sum, the district court did not "(1) fail[] to afford consideration to relevant factors that were due significant weight, (2) give[] significant weight to an improper or irrelevant factor, or (3) commit[] a clear error of judgment in considering the proper factors." *Id*. at 1189 (quoting *Campa*, 459 F.3d at 1174).  So it did not did not abuse its discretion by imposing a substantively unreasonable sentence. *See id*.

### III.      CONCLUSION

We conclude that the district court did not err in denying Youngblood's acquittal motion, because the evidence was sufficient to convict him of the offense.  Nor did the court commit a clear error of judgment in sentencing him to 210 months' imprisonment given the facts of this case.

**AFFIRMED.**