[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-13702

_____

D.C. Docket No. 1:08-cr-00371-ODE-AJB-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

STEVEN BERNARD JORDAN,
a.k.a. Steven Dodson,
a.k.a. Ladarius Timmons,

Defendant - Appellant.

_____

No. 10-13703

_____

D.C. Docket No. 1:08-cr-00371-ODE-AJB-4

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BENJAMIN D. SMARR,

Defendant - Appellant.

_____

No. 10-13747

_____

D.C. Docket No. 1:08-cr-00371-ODE-AJB-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CALVIN THOMAS FURLOW,

Defendant - Appellant.

_____

No. 10-13748

_____

D.C. Docket No. 1:08-cr-00371-ODE-AJB-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ADRIAN ANTOINE CAMPBELL,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(August 21, 2012)

Before WILSON and EDMONDSON, Circuit Judges, and VINSON,[*] District
Judge.

PER CURIAM:

The defendants, Steven Bernard Jordan, Benjamin D. Smarr, Calvin Thomas

Furlow, and Adrian Antoine Campbell, were convicted after a week-long jury trial

of a cocaine drug conspiracy and related offenses. They bring this direct appeal,

challenging their convictions and sentences on numerous grounds. After review,

and with the benefit of oral argument[1], we affirm.

I.

Evidence admitted during the trial permitted the jury to find the following

facts:

_____

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

[1] Case Nos. 10-13703 (Smarr) and 10-13748 (Campbell) went to oral argument; Case
Nos. 10-13702 (Jordan) and 10-13747 (Furlow) were submitted on the briefs.

3

At the time relevant to this case, J.C. Pitts was a detective with the DeKalb County, Georgia, Police Department. He was assigned to the High Intensity Drug Trafficking Areas Task Force, which is a joint state and federal program focused on investigating large scale drug trafficking organizations. On January 8, 2007, Detective Pitts received a telephone call from an agent with the Drug Enforcement Administration in Anderson County, South Carolina. The agent told Detective Pitts about a recently-arrested drug dealer, Mario Woods, who had agreed to become a confidential informant and provide information about drug transactions in DeKalb County in exchange for leniency in a criminal case that was pending against him in South Carolina. Thereafter, Detective Pitts met with Woods and learned that, over the preceding four months, Woods had bought cocaine from one of the defendants, Calvin Thomas Furlow, on a regular basis. These transactions --- which occurred two to three times each week, and involved between two to seven kilograms each time --- took place at Furlow's residence at 1123 Redan Way in Stone Mountain, Georgia. After partially verifying this information,[2] and conducting preliminary surveillance of Furlow's house, Detective Pitts decided

---

[2] Detective Pitts verified that Furlow lived at 1123 Redan Way, and he listened to some previously recorded phone conversations from January 5-7, 2007 (before Woods first talked to Detective Pitts) in which Furlow told Woods that he was in the process of trying to obtain more cocaine.

4

that he would use Woods to make a controlled buy of five kilograms of cocaine from Furlow "like the ones that had been going on for months . . . [and] arrest all parties involved[.]"

For a couple of weeks before the controlled buy, Detective Pitts monitored a series of telephone calls between Woods and Furlow in which the two men tried to finalize the deal. Furlow informed Woods during these conversations --- some of which were recorded, some of which were not --- that he had two general sources of cocaine supply: a Hispanic man in Kennesaw, Georgia (his "primary source of supply"), and his "cousin" who drove a Department of Transportation dump truck (his "secondary source of supply").[1] At some point during their discussions (it is not clear exactly when) Furlow told Woods that "his cousin that drive [sic] the dump truck had to bring it [the cocaine]." However, on January 23, 2007, Furlow informed Woods that his "secondary source of supply had not come through," but that his "primary source of supply out of Kennesaw" now had enough cocaine to complete the deal. Furlow told Woods that he was planning to drive to Kennesaw "first thing in the morning" to pick up the drugs.

At approximately 8:30 the next morning, January 24, 2007, Detective Pitts

---

[1] As will be discussed, this "secondary source of supply" was subsequently identified as defendant Adrian Antoine Campbell. Although Furlow referred to him as his cousin, there does not appear to be any evidence in the record of a familial relationship between the two men.

5

set up surveillance of Furlow's house on 1123 Redan Way. He positioned himself in an unmarked police car across the street from the house next door to Furlow's residence, pointing in the direction of both houses. Detective Pitts explained that he was to be "the eye" of the operation, which meant that he was there to observe the scene and, in his words, report "anything" and "everything" he saw by police radio to other officers who were waiting in vehicles nearby. The surveillance team had expected that Furlow would leave for Kennesaw early in the morning to meet his primary supplier (as he had told Woods), and they planned to follow him there "to identify that particular source of supply." Detective Pitts thus testified that the surveillance team on Redan Way that morning was expecting to conduct "mobile surveillance." However, Furlow did not leave his house that morning and, in fact, nothing happened for several hours.

At around 3:05 that afternoon, a red Ford Focus drove past Furlow's house and backed into the driveway of the house next door, across from where Detective Pitts was parked. Detective Pitts "immediately became suspicious" of the vehicle because, based on his earlier surveillance, he believed that house was vacant. The car did not pull all the way in, but rather it stopped near the end of the driveway --- about 20 feet from Detective Pitts's car. Due to the close proximity between the two vehicles, Detective Pitts "slumped down" in his seat so that he would not be

6

seen. Even from this position, however, he had an unobstructed view of the Ford Focus and could see the occupants "pretty clearly." There were two men in the vehicle: Defendants Benjamin D. Smarr, the driver and registered owner, and Steven Bernard Jordan, the passenger. Neither man got out of the car; they just "talk[ed] back and forth . . . for a few minutes."

While the car was parked in the driveway, Detective Pitts observed Jordan retrieve a black bag from somewhere in the vehicle. After holding and "messing with the top" for a few minutes, Jordan passed the black bag to Smarr, who then exited the car and walked across the yard to Furlow's house. The bag was "heavy and flat on the sides" and large enough to hold five kilograms of cocaine. When he got to Furlow's front porch, Smarr talked to someone at the door for a few minutes, after which Smarr handed the bag off "very quickly" and immediately returned to his car.[4]

---

[4] From his position across the street --- and because the front door of Furlow's house was inset --- Detective Pitts was not able to see who Smarr talked and gave the bag to. However, he was able to see this person's arm and "a white sleeve." Photographs introduced into evidence at trial show that Furlow was wearing a shirt with white sleeves. During re-direct, Detective Pitts testified that it was Furlow's sleeve he saw at the door when Smarr brought the bag to the house.

As will be noted further infra, there is some disagreement as to whether Detective Pitts told the other officers over the radio that he saw Smarr drop the black bag off at Furlow's house. Detective Pitts testified that he did, but the officers on the other end of his transmissions did not recall him mentioning Smarr or the black bag. In either event, Detective Pitts testified that "[a]t that particular time it was very suspicious, but I did not know for a fact that cocaine was in that bag." Indeed, at that time the agents were still operating under the assumption that Furlow was

7

Smarr got back in the driver's seat when he returned to the car, and he and Jordan "sat there conversing in the vehicle." At no point did they exit the car and go up the driveway to the house where they were parked. Several minutes later, at approximately 3:35 p.m., a Department of Transportation dump truck pulled up and stopped in front of 1123 Redan Way. Detective Pitts testified "I immediately thought to myself based upon the previous phone conversations that this must be the secondary supplier he [Furlow] had been referring to throughout all the entire phone calls." Defendant Adrian Antoine Campbell was the sole occupant of the truck. He exited the vehicle, retrieved a traffic vest and paper lunch bag from the passenger side --- the latter of which, Detective Pitts testified, was <u>not</u> big enough to carry five kilograms of cocaine[5] --- and entered Furlow's house. Five minutes later, Campbell left the residence without the traffic vest or the lunch bag, and he walked across the yard to the Ford Focus parked next door. He stood outside of the vehicle and talked to Smarr and Jordan. At or around the same time that Campbell exited the house (Detective Pitts testified that it occurred "almost simultaneously"), Furlow called Woods and told him "the cocaine was at the

---

going to leave to get the cocaine from his primary source of supply in Kennesaw.

[5] Five kilograms is a little more than eleven pounds. The lunch bag that Campbell carried into the house (which was not photographed or booked into evidence) was described at trial as a "small brown . . . little lunch sack."

8

house, and he was ready to conduct the transaction. He even told him to hurry."
Woods arrived at Furlow's house a few minutes later.

When he got to the house, Woods immediately recognized both the red Ford Focus and Campbell. He testified that "every time" he bought cocaine from Furlow at his house the red Ford Focus was parked (rear-side first) in the driveway of the house next door, as it was on this occasion, and he remembered seeing Campbell at the car --- along with another man he could not identify --- during at least one prior drug transaction. Woods, who was wearing a wire, then had the following recorded exchange with Detective Pitts:

> **Mario Woods:** Hey, yeah that's the cousin right there man, the dude that normally bring it. So ya'll better get that red car too.
>
> **Detective Pitts [to the other officers]:** 38. The guy from the dump truck is talking to this little four-door red car in the driveway next door. The car next door may be the one holding it. The little red four-door car next door, that's going to need to be taken down also, [Woods] recognized the car and said that's the cousin. If this red car goes mobile, this is the one that we want to take, the little red four-door newer model car. I can't tell what kind it is. That's who the dump truck guy is talking to. It's been sitting in the driveway next door for about twenty minutes.

As Woods approached the house, he testified that Campbell said something to him (he did not recall what). Woods then went into Furlow's house and saw the

9

cocaine in the kitchen, "sitting on the side of the floor by the counter." Furlow moved the drugs up to the counter, after which Woods verified that it was cocaine, made an excuse to leave the house (telling Furlow that he had to go to his truck and get the money), and gave law enforcement a pre-arranged signal that the drugs were there.

At that time, the officers executed a search warrant on Furlow's house. Upon entering the house, Detective Pitts saw five large "bricks" of cocaine on the kitchen counter. The black bag --- now empty --- was lying right next to and "touching" the cocaine. The traffic vest that Campbell brought into the house was on a table next to the kitchen counter. Detectives found a bag containing 117 grams of cocaine in the cupboard, and they recovered a handgun, an assault rifle, and a shotgun in the master bedroom. Furlow attempted to flee, but he was apprehended in the rear of the house. The other three defendants were arrested outside. A bag containing 250 grams of cocaine (apparently from a different batch than the five kilograms inside the kitchen) was found on the floorboard of Campbell's dump truck, and more than $7,000 in cash was found in his jacket pocket. The detectives found $2,300 in cash in Jordan's pocket. No drugs or money were found on Smarr.

The defendants were later charged with conspiracy to possess with intent to

10

distribute cocaine, and with possession with intent to distribute cocaine. It was the government's theory that Smarr and Jordan brought the drugs to Furlow's house in the black bag, while Campbell was the "broker" of the deal. Furlow was separately charged with possession of firearm by a convicted felon.[6]

The defendants each pled not guilty, and, as the case progressed, they began to have conflicting defenses. Smarr, Jordan, and Campbell each claimed that they were merely present at Furlow's house while others were responsible for the drugs. Smarr and Jordan pointed the finger at Campbell, contending that he could have brought the cocaine into Furlow's house concealed in the traffic vest. Meanwhile, Campbell argued that the cocaine had already been brought into the house by the time he arrived, perhaps by Smarr in the black bag. Prior to trial, Campbell moved to sever his case from the others. That motion was denied, and the case proceeded to a five-day jury trial. The government called Detective Pitts and Woods as their main witnesses, along with, inter alia, two chemists who testified that the "bricks" of cocaine found in Furlow's kitchen weighed a total of 5.0395 kilograms.

---

[6] Furlow was also charged with conspiracy to possess with intent to distribute marijuana (which was severed prior to trial), and possession of firearms in furtherance of a drug trafficking crime (which was dismissed on his motion for directed verdict). Neither of these two charges is at issue in this appeal.

Prior to trial, and after the evidence closed and after the jury was instructed on the law, Smarr requested that the district court instruct the jury on his theory of defense, to wit, that he was "merely present" at the scene. Despite a lengthy back-and-forth, however, the parties could not agree on a theory of defense instruction. After the court determined that it had "exhausted all of the possibilities to give a theory of the defense charge," it declined to give a mere presence instruction after explaining: "I think I will just rest on the charge that's already been given which does completely cover the concepts that you all are interested in as far as the theory of the defense goes."

Before the jury started deliberating, the district judge commented to the jury that she had been told there was "cocaine residue" in the black bag, and thus it was not going to be sent into the jury room during their deliberations (although the jury could see it if they asked).[7] Shortly after retiring to the jury room, the jury sent a note asking if it was "certain" that there were cocaine traces inside the black bag and, if so, whether the traces could be considered as evidence. The district court responded as follows:

> The answer to your question is no. There is no evidence

---

[7] The comment about cocaine residue was apparently based on a statement from one of the government attorneys, who advised the court that there may have been residue in the black bag because counsel had placed the cocaine bricks in the bag during trial.

12

that any such cocaine trace has ever --- such alleged cocaine trace has ever been tested to see if it's cocaine.

Furthermore, I have to point out to you that there is no evidence that the [black] bag when it was taken from the scene had any cocaine trace in it. There's just no evidence in the record about that.

The [black] bag which is still here in the courtroom and which I have not looked inside myself was handled during the court proceedings by one or more of counsel, I don't recall exactly, and it may be that now it has some traces of something in it, and so out of an abundance of caution, we're not giving you the [black] bag.

Again, as I said, if you want to look inside it you could. The court security officer will bring it to you, but there really is no evidentiary significance at this point whether there is or is not traces of something inside the bag because there's been no actual evidence put in on that point.

The jury subsequently found all four defendants guilty on the two drug counts. In a special verdict form, the jury attributed at least five kilograms of cocaine to Furlow and Campbell, while it attributed only 500 grams or more of cocaine to Jordan and Smarr. The jury also found Furlow guilty of possession of a firearm by a convicted felon. The defendants then proceeded to sentencing.

At sentencing, the district court found that the government established by preponderance of the evidence that (contrary to what the jury had found) Smarr and Jordan were responsible for the five kilograms of cocaine. The district court

13

reasoned:

> I think that because the black bag which Mr. Smarr
> carried into Mr. Furlow's house and which Mr. Jordan
> handed to Mr. Smarr so that he could carry it into the
> house very likely contained the same amount that the lab
> came up with, the 5.0395.

Thus, all defendants were held responsible for five kilograms. Furlow, Campbell,

and Jordan were sentenced to the statutory minimum mandatory sentence of 240

months incarceration, followed by ten years supervised release.[8] Smarr, who had

no prior criminal record, was sentenced to the statutory minimum mandatory

sentence of ten years incarceration, followed by five years supervised release. The

defendants now appeal.

## II.

The defendants have collectively raised nine issues on appeal, but only the

following four warrant discussion:

> (1) Whether there was sufficient evidence to support the
> jury's verdict on the conspiracy and the possession with
> intent to distribute charges (Smarr and Campbell);
>
> (2) Whether the district court erred in refusing to sever
> Campbell's trial from the other defendants (Campbell);
>
> (3) Whether the district court erred when it commented

---

[8] Furlow also received a 10-year sentence on the firearm charge, to run concurrently with the drug sentences.

on there being "cocaine residue" in the black bag (Smarr and Jordan); and

(4) Whether the district court erred in refusing to give a "mere presence" theory of defense instruction (Smarr).[9]

### III.

*A. Sufficiency of the evidence*

Smarr and Campbell contend that the evidence was insufficient to convict them of the conspiracy and possession offenses. "In reviewing the sufficiency of the evidence underlying a conviction, we consider the evidence 'in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor.'" United States v. DuBose, 598 F.3d 726, 729 (11th Cir. 2010) (citation omitted). In deciding if there was sufficient evidence, the question is whether "'reasonable minds could have found guilt beyond a reasonable doubt, not whether reasonable minds must have found guilt beyond a reasonable doubt.'" United States v. Bacon, 598 F.3d 772, 775 (11th Cir. 2010) (citation omitted)

---

[9] Two of the five issues that do not warrant discussion are sentencing arguments: Smarr and Jordan challenge, as contrary to the jury verdict, the quantity of cocaine that was attributed to them at sentencing, and Campbell and Furlow challenge the constitutionality of their statutory minimum mandatory sentences. But, the defendants have all but conceded in their briefs and/or at oral argument that the sentencing arguments are foreclosed by binding circuit precedent. Thus, whatever the possible merits of those two arguments, they are rejected on the basis of our prior panel rule. United States v. Smith, 122 F.3d 1355, 1359 (11th Cir. 1997) ("Under the prior panel precedent rule, we are bound by earlier panel holdings . . . unless and until they are overruled en banc or by the Supreme Court.").

(emphasis in original).

To convict someone of conspiracy, the government must show with proof beyond a reasonable doubt "(1) that a conspiracy existed; (2) that [the defendant] knew about the conspiracy; and (3) that [he] knowingly joined the conspiracy." United States v. Garcia-Bercovich, 582 F.3d 1234, 1237 (11th Cir. 2009); accord United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001). The knowledge requirement will be satisfied when the government establishes that the defendant was aware of the essential nature of the conspiracy. See United States v. Ndiaye, 434 F.3d 1270, 1294 (11th Cir. 2006). Mere presence at the scene of a crime and close association with a co-conspirator does not establish knowing participation, but knowledge can be established through the surrounding circumstances, such as acts committed by the defendant that furthered the purpose of the conspiracy. See United States v. Vera, 701 F.2d 1349, 1357 (11th Cir. 1983). Thus, agreement and participation in the conspiracy do not have to be explicit, but can be "inferred from circumstantial evidence." See United States v. Prince, 883 F.2d 953, 957 (11th Cir. 1989). To be sure, "[b]ecause of the clandestine nature of most conspiracies, they must often be proven using circumstantial evidence." United States v. Humphrey, 34 F.3d 551, 555 (7th Cir. 1994).

Based on the evidence, admittedly circumstantial, presented in this case, a

16

reasonable jury <u>could</u> have determined that Smarr and Campbell knowingly and willfully conspired to possess with intent to distribute cocaine. Taking Smarr first, the evidence, viewed in the light most favorable to the government, showed that he parked his red Ford Focus (rear-side first) in the driveway of an apparently-vacant house next door to Furlow's residence. After sitting in the car for several minutes (without ever attempting to get out of the car and go up to the house where it was parked), his passenger, Jordan, "mess[ed] with" the top of a black bag and passed it to Smarr, who proceeded to walk across the yard and "quickly" deliver that bag to Furlow. Smarr then returned to his car and, rather than leave, he continued to wait in the vehicle for several minutes. When the confidential informant arrived shortly thereafter he recognized Smarr's vehicle as having been parked in exactly the same way at the exact same location "every time" that he bought cocaine from Furlow at his house.[10] The cocaine was found minutes later in Furlow's kitchen, in very close proximity to the now-empty black bag.[11] This

---

[10] To the extent the defendants argue on appeal, as they did at trial, that Woods was an admitted cocaine dealer whose "self-serving testimony" (given in exchange for leniency in his then-pending criminal case) was not credible, we need only say that credibility determinations are the sole province of the jury --- regardless of the character and possible motivations of the witness. <u>United States v. Hewitt</u>, 663 F.2d 1381, 1385 (11th Cir. 1981) (jury entitled to believe the self-serving testimony of "scoundrels, liars and brigands" given in exchange for immunity).

[11] Smarr emphasized in his briefs and at oral argument that the black bag was touching and lying next to the cocaine only after Furlow moved the cocaine from the kitchen floor to the counter. The evidence is not clear whether the cocaine was moved from the floor to the table in the bag. (The prosecutor asked Woods that question on direct examination, but defense counsel

evidence was sufficient to sustain the guilty verdict as to Smarr.

Smarr does not make much of an effort to deny that the above evidence ---viewed in the government's favor --- was sufficient to support the guilty verdict. Rather, he challenges the believability of the central and most important piece of that evidence: Detective Pitts' testimony about the black bag. Smarr argues that Detective Pitts was either mistaken about what he saw, or he deliberately lied and "retrospectively created [a] story" in order "to make the evidence fit his theory" of the case. This argument was made during trial, but Detective Pitts testified that he could see what happened "pretty clearly" and he was "positive" and "one hundred percent certain" that he saw Jordan give the bag to Smarr, who took it to the house and gave it to Furlow. By its guilty verdict, the jury necessarily believed Detective Pitts. Indeed, if the jury did not believe that Smarr and Jordan had brought the bag and that it contained (at least some of) the cocaine, the remaining evidence against them (e.g., parking in the driveway next door, and talking to Campbell when he left Furlow's house) would have been insufficient to convict. Although the jury verdict is not without problems and ambiguities in some respects, as will be noted

---

objected on leading grounds. The district court sustained the objection and the question was not re-phrased). Regardless, it is clear that the bag was in the kitchen and in relative close proximity to the cocaine (even when it was on the floor). More notably, in contrast to what Detective Pitts testified to having seen outside the house mere minutes before, the bag was "completely empty" when the agents entered the house.

further infra, it is manifest that they believed Detective Pitts when he testified that he saw Smarr and Jordan with the black bag. Smarr concedes as much in his brief when he states that "for the jury to bring back a guilty verdict against Mr. Smarr, it had to believe Detective Pitts." As we explained in the context of Woods' testimony, see note 10 supra, an appellate court cannot second guess a jury's decision to believe a witness. United States v. Andrews, 953 F.2d 1312, 1318 (11th Cir. 1992) (whether to believe a witness "is the sole province of the jury" and court of appeals "will not overturn a jury's decision to believe a witness").

The evidence against Campbell was also sufficient to sustain his conspiracy conviction, on the government's "brokerage theory." Campbell, the government contends, was the one who arranged for the cocaine to be delivered to Furlow by Smarr and Jordan. The evidence at trial established that Campbell (who drove the Department of Transportation dump truck) was Furlow's "secondary source of supply." Woods testified that earlier on, when he and Furlow were still trying to arrange the cocaine deal, Furlow had told him that his supplier who "drive[s] the dump truck had to bring it." A reasonable jury could have found, based on the evidence, that Campbell had entered Furlow's house minutes before Furlow told Woods that he was finally ready to complete the transaction, and that he (Campbell) was in the kitchen where the cocaine was later found, as evidenced by

19

his leaving the traffic vest behind on the table. "Almost simultaneously" as Campbell left the house and went outside to meet with Smarr and Jordan, Furlow called Woods and told him that the cocaine was now available for pick-up. When Woods arrived at the house he immediately recognized Campbell as having been present for, and waiting at the red Ford Focus during, at least one prior drug deal. When Campbell was arrested, he had more than $7,000 in cash in his pocket and cocaine (albeit from a different batch) in his dump truck. A jury is "free to choose between or among the reasonable conclusions to be drawn from the evidence[.]'" United States v. Garcia, 447 F.3d 1327, 1334 (11th Cir. 2006) (citation omitted). The jury had ample evidence to support a finding of joint participation by Smarr and Jordan, with Campbell as the broker, in delivering the cocaine to Furlow.[12]

The evidence was likewise sufficient to support the substantive offense of possession with intent to distribute cocaine. To support a conviction for this offense, the government must prove "'(1) knowing (2) possession of a controlled

---

[12] In the course of arguing that the evidence was not sufficient to sustain his conviction, Campbell notes that the agents had expected Furlow to leave his house that morning to get the cocaine from his "primary source of supply" in Kennessaw. All that shows, however, is that the plan changed. Indeed, as indicated above, Woods testified at trial that at some point during their preliminary phone calls Furlow told Woods that his secondary supplier who "drive[s] the dump truck had to bring it." Whatever the reason for the changes in plan on January 24th (or, perhaps, the switch back to the original plan), the evidence was enough for the jury to find that, despite what the agents had expected and planned for that morning, Furlow arranged to get the cocaine from his secondary source (via Jordan and Smarr) instead of his driving to Kenessaw to get the drugs directly from his primary source.

20

substance (3) with intent to distribute it.'" United States v. Freyre-Lazaro, 3 F.3d 1496, 1504 (11th Cir. 1993) (citation omitted). Possession can be joint or sole and actual or constructive. E.g., United States v. Crawford, 906 F.2d 1531, 1535 (11th Cir. 1990).

The same evidence that was sufficient to sustain the conspiracy charge, as set forth above, is enough to sustain the possession with intent to distribute charge against the defendants as joint possessors. Further, the evidence also supports the conviction of each defendant on an aider and abettor theory. It is unchallenged that Furlow possessed the cocaine found in his kitchen. The defendants were charged in the indictment with aiding and abetting each other to distribute this cocaine, and the district court instructed the jury on aider and abetter liability. To convict under an aider and abetter theory, the government had to establish that the defendants "associated themselves with the [cocaine distribution] venture and sought by their actions to make the venture a success." See Freyre -Lazaro, 3 F.3d at 1504. The defendants' participation in the drug conspiracy "was sufficient to support their convictions for possession with intent to distribute cocaine on an aiding and abetting theory." See id.; see also United States v. Farris, 77 F.3d 391, 395 (11th Cir. 1996) (rejecting a sufficiency-of-the-evidence challenge to conspiracy charge, then holding: "The evidence, which is sufficient to support the conspiracy charge,

21

supports the possession charge because it shows [defendant] to have been an aider and abettor.").

We recognize that to some extent the jury's verdict does not fit together very neatly. As previously indicated, the jury clearly believed Detective Pitts' testimony about the black bag, or it would not have found Smarr and Jordan guilty. However, since the jury credited that testimony, it raises the question: why did the jurors not hold Smarr and Jordan responsible for all five kilograms, as they did Furlow and Campbell? At the sentencing hearing, the lawyers and the court speculated about possible reasons for this apparent inconsistency, including the possibility that the jury concluded that certain of the cocaine "bricks" were carried in the black bag, while one or more others were brought by Campbell under his traffic vest. Under this possible explanation, Smarr/Jordan and Campbell each brought less than five kilograms; but, Campbell was also responsible for the cocaine found in his truck, and, as Furlow's supplier, the cocaine found in the cupboard as well (thus making him responsible for more cocaine than Smarr and Jordan). We need not decide or speculate on what the jury was thinking with regard to its quantitative verdicts. Whatever the jury was thinking, the evidence was sufficient to support Smarr's and Jordan's convictions of conspiracy and possession with intent to distribute cocaine, and the district judge's attribution to

22

them of the full five kilograms for sentencing purposes was supported by a preponderance of the evidence. See United States v. Faust, 456 F.3d 1342, 1348 (11th Cir. 2006) (post-Booker courts can continue to consider relevant acquitted conduct proved by a preponderance of the evidence).

*B. Severance*

Prior to trial, Campbell moved to sever his trial from the other defendants, and his motion was denied. Campbell argues on appeal that the district court erred in refusing to sever because the government had a "strong case" against Furlow on the drug and firearm charges, while it had a "weak case" against him and the other defendants. Trying these cases together, Campbell maintains, created "intolerable tension" between the defendants that ultimately resulted in "antagonistic defenses."

In determining if a joint trial (or severance) is appropriate, the district court must "balance the prejudice that a defendant may suffer from a joint trial, against the public's interest in judicial economy and efficiency." United States v. Cross, 928 F.2d 1030, 1037 (11th Cir. 1991). "This court is reluctant to reverse a district court's denial of severance, particularly in conspiracy cases, as generally 'persons who are charged together should also be tried together.'" United States v. Knowles, 66 F.3d 1146, 1158 (11th Cir. 1995) (citation omitted); accord, e.g.,

23

United States v. Leavitt, 878 F.2d 1329, 1340 (11th Cir. 1989) ("coconspirators should usually be tried together"). We review the district court's denial of a motion for severance for clear abuse of discretion. See United States v. Hill, 643 F.3d 807, 828 (11th Cir. 2011). To prevail, "defendant must carry the 'heavy burden' of demonstrating that he 'suffered compelling prejudice' and received an unfair trial." United States v. Kennard, 472 F.3d 851, 858-59 (11th Cir. 2006) (citation omitted). A defendant meets his burden by showing that the jury "was unable to sift through the evidence and 'make an individualized determination as to each defendant.'" United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997) (citation omitted). This is not easily shown, particularly if the jury is instructed to consider the charges and evidence against each defendant separately. See id. Indeed, "the strong presumption is that jurors are able to compartmentalize evidence by respecting limiting instructions specifying the defendants against whom the evidence may be considered." United States v. Blankenship, 382 F.3d 1110, 1123 (11th Cir. 2004).

Campbell has not carried his "heavy burden" of showing that he "suffered compelling prejudice" by being tried along with his co-defendants. The evidence implicated all four of them, and under the government's "brokerage theory," there were no obvious antagonistic defenses. Even if it is assumed, however, that he and

24

the other defendants had antagonistic defenses, the Supreme Court has made clear that "antagonistic defenses are not prejudicial per se." See Zafiro v. United States, 506 U.S. 534, 538, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993). To the extent that he argues there was prejudice because the government had little evidence against him (the case was "weak"), while it had much more evidence against Furlow (the case was "strong"), even if true, that does not qualify as prejudice. "The mere fact that there may be an enormous disparity in the evidence [against one of the defendants] compared to the other defendants is not a sufficient basis for reversal. A defendant does not suffer compelling prejudice, sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants." Schlei, 122 F.3d at 984 (quotation marks and citation omitted). Further, the district court properly instructed the jury that it must separately consider each defendant, each charged offense, and all the evidence related thereto. Those instructions mitigated any possible prejudice. See id. (district court "avoided any potential prejudice" by issuing substantively identical instructions).

For these reasons, the district court did not clearly abuse its discretion in denying Campbell's motion for severance.

C. District court's comment on "cocaine residue" in the black bag

The district court told the jury that it would not send the black bag into the

25

jury room during deliberations because it had "cocaine residue" in it. Smarr and Jordan argue that this comment was error, and the government impliedly agrees. However, showing error is not enough to warrant reversal. "Reversal is warranted only if the court made prejudicial comments that had a clear effect on the jury and amounted to the denial of a fair trial." United States v. Tampas, 493 F.3d 1291, 1303 (11th Cir. 2007).

Smarr's lawyer maintained during the trial (and on this appeal) that there is insufficient evidence that Smarr carried the black bag to Furlow's house. It is his contention that Detective Pitts --- the only witness who testified that he did so --- fabricated the story in a convenient attempt to tie all four defendants together and explain their joint presence at the scene of the crime. Smarr argues that Detective Pitts did not tell the other officers over the radio that he had seen Smarr carry the bag to Furlow's house, see note 4, supra, and he notes that Detective Pitts told the officers that the Ford Focus "may be the one holding it" (present tense) after he purportedly saw Smarr give the bag to Furlow, thereby suggesting that Detective Pitts made the story up after-the-fact. Smarr thus contends that the district court's comment about there being "cocaine residue" in the bag impermissibly bolstered the only witness at trial who testified to having seen him with that bag.

The jurors were apparently confused by the court's comment. Indeed, they

sent a question back to the judge shortly after they began their deliberations and asked: "Is it certain that there is cocaine trace inside of the black plastic bag, and are we allowed to consider that as evidence?" The judge replied: "The answer to your question is no. There is no evidence that any such cocaine trace has ever --- such alleged cocaine trace has ever been tested to see if it's cocaine." The judge further emphasized: "I have to point out to you that there is no evidence that the [black] bag when it was taken from the scene had any cocaine trace in it. There's just no evidence in the record about that."

While the district court may have erred in making the "cocaine residue" comment, the error was harmless as it was corrected by the court's answer to the jury's question, which unequivocally stated that "[t]here is no evidence" that the black bag ever had any trace of cocaine in it.[13] "Viewing the record in its entirety, the prejudicial effect of the comment, if any, appears negligible and, in light of the evidence, could not have affected the jury's verdict." United States v. Williams,

---

[13] Smarr contends that this word choice ("there is no evidence") implied to the jury that, while there was no evidence introduced on this point, the district judge must have been "privy" to information that was not provided to the jury. This argument is unpersuasive, however, as the jury was instructed in its final charge that the jurors "must make your decision based only on the testimony and evidence presented during the trial." The jurors were further instructed that "you must consider only the evidence admitted. The term 'evidence' includes the sworn testimony of the witnesses, any exhibits admitted into the record and any stipulations of fact agreed on by the parties." It is axiomatic that "[a] jury is presumed to follow its instructions. Similarly, a jury is presumed to understand [and accept] a judge's answer to its question." Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000) (citations omitted).

27

530 F.2d 1157, 1158 (5th Cir. 1976) (binding precedent under <u>Bonner v. City of</u>

<u>Prichard, Ala.</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc)).

*D. District court's failure to give theory of defense instruction*

Finally, Smarr contends that the district court erred in refusing to give his

theory of defense jury instruction. His first proposed instruction was as follows:

> Mr. Smarr's theory of defense is that he did not
> participate in the possession with the intent to distribute,
> nor the distribution of, any amount of cocaine, either as a
> direct participant or as part of a conspiracy. Mr. Smarr
> was merely present at the time other individuals may
> have been engaging in a drug transaction. If you find that
> Mr. Smarr did not possess or distribute the drugs, or if
> you simply have a reasonable doubt about whether he
> participated in the possession or distribution of drugs,
> then you are obligated to find him not guilty on Counts 1
> and 2.

The district court initially tried to accommodate Smarr's request. There was a

lengthy back-and-forth discussion between the judge and the attorneys --- before

and after the jury was charged --- but agreement on the language of the instruction

could not be reached. Smarr then proposed an amended instruction which stressed

his theory that "Campbell brought the five kilograms of cocaine to the location."

The district judge ultimately declined to give a theory of defense instruction ---

apparently out of concern over whether and to what extent a similar instruction

would need to be given for the other defendants --- and concluded that "I think I

28

will just rest on the charge that's already been given which does completely cover the concepts that you all are interested in as far as the theory of the defense goes."

"District courts have broad discretion in formulating jury instructions[.]" United States v. Mintmire, 507 F.3d 1273, 1293 (11th Cir. 2007). Refusal to give a requested theory-of-defense instruction is reviewed for an abuse of discretion. See, e.g., United States v. Arias–Izquierdo, 449 F.3d 1168, 1185 (11th Cir. 2006). The district court abuses its discretion and commits reversible error in failing to give a requested jury instruction only if:

> (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself.

Hill, 643 F.3d at 850 (citation omitted); accord, e.g., United States v. Paradies, 98 F.3d 1266, 1286 (11th Cir. 1996).

The district court did not abuse its broad discretion in refusing to give the jury Smarr's theory-of-defense instruction because the substance of his proposed instruction was "substantially covered" by those instructions that were given. The court instructed the jury on the conspiracy count that "mere presence at the scene of a transaction or event or the mere fact that certain persons may have associated

29

with each other and may have discussed common aims and interests does not standing alone establish proof of a conspiracy." Similarly, as for the possession with intent to distribute cocaine count, the district court instructed the jury that "[m]ere presence at the scene of a crime or even knowledge that a crime is being committed are not enough to establish that defendant either directed or aided and abetted the crime."

Smarr argues, however, that his proposed instruction was not "substantially covered" by the ones that were given. He contends that his instruction --- after it was amended to address the district court's initial concerns --- went beyond "mere presence" in the sense that it "involved pointing the finger at someone else, namely one of his co-defendants." This argument is not persuasive. As a matter of common sense and logic, the fact that Smarr pled not guilty and his trial attorney argued that he just happened to be at Furlow's house at the time of the deal (and had nothing to do with the cocaine that had been brought there) can only mean that he was, in fact, "pointing the finger at someone else." After all, if he did not bring the cocaine, that necessarily means someone else did. The district court instructed the jury that, to be found guilty of the conspiracy and possession with intent to distribute charges, Smarr must have acted "knowingly" (i.e., "voluntarily and intentionally and not because of mistake or accident") and "willfully" (i.e.,

30

"voluntarily and purposely with specific intent to do something the law forbids, that is, with bad purpose to disobey or disregard the law"). These instructions adequately and necessarily covered Smarr's theory of defense that someone else was responsible for bringing the cocaine to Furlow's house. To be sure, if Campbell had brought the drugs and Smarr was merely --- and innocently --- present at the scene, the jury could not have found that he acted knowingly and willfully. See United States v. Woodard, 531 F.3d 1352, 1364-65 (11th Cir. 2008) (observing and holding same).[14]

Accordingly, the district court did not abuse its broad discretion in refusing to give Smarr's theory-of-defense instruction.

## IV.

We raise, sua sponte, the issue of clerical errors in the judgment and remand with instructions that the district court correct the errors. United States v. Diaz, 190 F.3d 1247, 1251-53 (11th Cir. 1999) (remanding because the judgment

---

[14] Smarr argues that Woodard is "inapplicable" because the instruction in that case only covered a "mere presence" theory of defense, while, as noted above, he insists that his proposed instruction "involved pointing the finger at someone else." Once again, that argument must fail. Every time that a defendant pleads not guilty and claims to have been merely present at the scene of a crime he is necessarily "pointing the finger at someone else." The defendant in Woodard certainly was. Indeed, as was noted in that decision, Woodard's defense was based on the claim that one of his co-defendants, Spencer, "was the one who was involved in marijuana trafficking; Woodard was simply visiting at Spencer's residence when the police raid occurred --- he was, in short, at the wrong place at the wrong time." Id. at 1359.

31

reflected the wrong offense). However, correction of the judgment must "not prejudice the defendant in any reversible way." Id. at 1252.

Here, the jury convicted Smarr and Jordan of conspiracy and possession with intent to distribute offenses involving 500 grams or more of cocaine (but less than five kilograms), which is the amount punishable under Title 21, United States Code, Section 841(b)(1)(B). However, the written judgment for each defendant lists Section 841(b)(1)(A), rather than Section 841(b)(1)(B). Although, as previously discussed, the district court found by a preponderance of the evidence that they were responsible for five kilograms or more of cocaine for purposes of sentencing, they were not found guilty of the greater amount by the jury. Thus, the judgments do not reflect the basis of their convictions, but rather contain a clerical error which requires remand for correction. See Diaz, 190 F.3d at 1252. Accordingly, we vacate and remand with instructions to revise the written judgment.

## V.

For the foregoing reasons, the district court's judgment is **AFFIRMED**, but **REMANDED** with instructions to correct the clerical error in judgment.