[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-13275
Non-Argument Calendar

_____

D.C. Docket No. 3:19-cr-00110-RV-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHANE PATRICK SPRAGUE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(September 10, 2021)

Before WILSON, JILL PRYOR, and LUCK, Circuit Judges.

PER CURIAM:

Shane Patrick Sprague was convicted by a jury of one count of conspiracy to violate the Animal Welfare Act (Count 1), 7 U.S.C. § 2156, in violation of 18 U.S.C. § 371.  He now appeals his conviction, following his unsuccessful motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29.  He argues, first, that the evidence was procedurally insufficient to support his conviction for Count 1 because, under the terms of his indictment, the government failed to show he conspired to violate all three subsections of § 2156.  As to his substantive sufficiency-of-the-evidence arguments, he contends that the evidence did not prove that he ever attended or participated in a dog fight, assisted anyone else in an animal fighting venture, or agreed to any fights.  He highlights the evidence he presented in his defense to support his arguments.  Second, he asserts that, after a nine-day trial, the district court coerced the jury to begin deliberations late on a Friday evening and to continue deliberating until 2:00 AM the next day, culminating in a 16-hour final day of trial.  Which, Sprague contends, violated his rights to due process and a fair trial.  In this respect, he argues that the district court's comments to the jury, informing them of the possibility of returning either the next day or on the following Monday, constituted a "suggested or implied" *Allen* charge.[1]  We reject Sprague's arguments and affirm the district court.

---

[1] *Allen v. United States*, 164 U.S. 492, 501 (1896).

I.

Because we write for the parties, we assume familiarity with the facts and only set out those necessary to decide this appeal. In 2019, a federal grand jury returned a 44-count indictment against Sprague and four codefendants: Derek Jedidiah Golson, Haley Cook Murph, David Lee Moser, and James Peek. Under Count 1, the grand jury charged Sprague and his four codefendants with conspiring to violate the Animal Welfare Act, in violation of 18 U.S.C. § 371. Specifically, the indictment charged them with conspiring to: (i) sponsor and exhibit dogs in animal fighting ventures, in violation of 7 U.S.C. § 2156(a)(1) and 18 U.S.C. § 49; (ii) possess, train, sell, purchase, transport, deliver, and receive dogs for the same purpose, in violation of 7 U.S.C. § 2156(b) and 18 U.S.C. § 49; and (iii) use an instrumentality of interstate commerce for commercial speech for the purpose of advertising an animal for the same purpose, in violation of 7 U.S.C. § 2156(c) and 18 U.S.C. § 49.

Count 1 charged, inter alia, that Sprague and Golson created and operated "C Wood Kennels," where they housed and trained "pit bull-type dogs" for dog fights, acquired and maintained medical equipment to treat dogs without the assistance of a veterinarian, planned and carried out dog fights, and communicated with each other and others about various subjects related to dogfighting. The indictment charged various overt acts in furtherance of the conspiracy. As relevant

3

here, the indictment charged that on April 3, 2017, Sprague advertised a dog for sale online on Golson's behalf, and that Peek sold and delivered a dog to Sprague, who then sold and delivered it to another individual in Montana.

Murph, Peek, and Moser pleaded guilty to the offenses they were charged with. Sprague and Golson proceeded to trial together. The nine-day jury trial began on Tuesday, February 18, 2020. The government called ten witnesses during its case-in-chief. The first government witness was Andrew Ridgeway, a special agent with the United States Department of Agriculture (USDA) Office of the Inspector General. Ridgeway testified that, during a previous dogfighting investigation, an informant led him to Sprague as a possible suspect. On several occasions in 2017 and 2018, the informant placed recorded calls to Sprague while Ridgeway was listening remotely. The government played recordings of four such calls for the jury.[2]

Sprague described recent dog fights in some of the recorded conversations. For example, the following exchange occurred regarding a dog belonging to one of Sprague's "kennel partners":

> Sprague: I said, "That bitch ain't no joke. She going to kill whatever steps in front of her." . . . And . . . he threw . . . them two together—for about three minutes, and . . . [she] . . . put a beating on that little pup. But at the

---

[2] The transcripts, which the jury received as demonstrative aids while listening to the corresponding phone calls, were not introduced into evidence. Nevertheless, Sprague never challenged their authenticity below, and he does not do so on appeal.

same time, that pup [ ] never gave up and, she, when we broke them apart, she wanted more.

Informant: That's good man, and she's only, she's only ten months [old]?

Sprague: So, she's ten months and . . . I said I wouldn't touch her for about another six months at least.

Informant: Right.

Sprague: Just . . . put her right in front of [Sprague's dog] and [ ] let her just build that attitude up.

In another exchange, Sprague described testing a female dog he owned in several fights, and then using her for breeding puppies based on her performance in those fights. During that conversation, he stated the following:

Sprague: We . . . did some, some looks with her. We did . . . three looks with . . . one of my Jeep dogs. And . . . they grew up together rolling with each other . . . and then, uh, we did her fourth, . . . we put two on her, uh, back to back.[3]

Informant: Mm-hmm.

Sprague: And, uh, [she] devastated one of them. One of them was a, uh, a one-time winner out of south Florida— a heavy Mayday dog.

. . . .

---

[3] The government presented expert testimony that the phrase "looked at" could be interpreted to refer to a test match, that a "roll" was language dogfighters used to refer to a test match between dogs, and that "Jeep" and "Mayday" both referred to notable lineages of fighting dogs.

5

Sprague: And, . . . she's an insane [ ] dog, bro.  We, uh, we didn't want to do too much with her just 'cause we know how she is so we, we used her for breeding, you know . . .

Ridgeway testified that Sprague advertised certain puppies for sale on social media.  Ridgeway stated that in a post from April 3, 2017, Sprague explained that he was selling the puppies on behalf of his "kennel partner."  Ridgeway also testified that he reviewed Sprague's messages on social media.  In one message Sprague described a fight involving his dog named Batman and another dog, and his reluctance to take either of them to a licensed veterinarian for treatment afterward.  Later messages revealed that both dogs ultimately succumbed to the injuries sustained in that encounter.

Ridgeway also testified that he had accessed a website called "Peds Online," which showed, under the heading "C Woods Pups," a pedigree showing the lineage for a puppy produced by "Pimpin Cain," whose owner was Sprague, and "Lil Angel," whose owner was Golson.

Ridgeway and Robin Wilcox, another USDA special agent, testified that agents executed a search of Sprague's residence and recovered certain items, including pedigrees attesting to the lineage of certain dogs, single-use syringe needles, and seven pit bulls.

The government also called Dr. Elizabeth Pearlman, a forensic veterinarian with the American Society for the Prevention of Cruelty to Animals (ASPCA).

The government qualified her, without objection, as an expert in veterinary practice as well as in the use, and misuse, of veterinary drugs and instruments. Dr. Pearlman testified that she was present at Sprague's property during the search and that she had an opportunity to walk through the premises. As to the seven dogs seized, she testified that of the four that were of adult age, two had scars suggestive of or consistent with dogfighting. She also evaluated photographs of some of the other items recovered during the search on Sprague's residence. She testified that one of the items appeared to be a used intravenous (IV) bag, and another appeared to be an IV catheter intended for use on animals.

Later, the government called Amy Taylor, a Virginia state government investigator. The government tendered her, without objection, as an expert in dogfighting. She testified that photographs of the items seized from Sprague's residence included "break sticks," used to force open a dog's jaws once it had latched onto another animal. She observed that one of the break sticks depicted in the photograph appeared to bear the writing "C Woods Kennels." She testified that pit bulls were the preferred breed in dogfighting, that dogfighters were often heavily involved in breeding for traits considered to be advantageous in fights, and that pedigrees were of great importance in this respect. She examined other items found at Sprague's residence and testified that they were consistent with tools used to train dogs for dogfighting.

7

After the government concluded its examination of Taylor and rested its case, Sprague and Golson each moved for a judgment of acquittal. Sprague argued that the evidence only raised a few inferences favorable to the government, but not enough "to prove a prima facie case," and that none of the evidence showed that he possessed any dogs with the intent to fight. The district court denied both defendants' motions.

In defense, Sprague called a number of witnesses, including his father; his mother; his wife; two of his daughters; and an expert witness on pit bulls, dogfighting, dog show competitions, and the preservation of certain dog breeds. These witnesses testified, essentially, that Sprague was a dog lover who treated his dogs well and that the training the government had emphasized was also used for legal dog showing competitions, which Sprague participated in.

Sprague testified, in his own defense, that he had a long history with dogs and loved pit bulls but had never engaged in dogfighting. As to the recorded calls, he testified that the statements he had made during the calls were not true, and he was simply attempting to lure the informant to his house in order to "whoop his ass." He testified that "C Wood Kennels" was merely an informal club that he and Golson ran together for the purposes of keeping dogs and showing them at competitions.

8

After Sprague rested, Golson presented his defense. Golson rested his case at 4:46 PM on Friday, February 28, 2020. After the government declined to offer any evidence in rebuttal, the district court stated the following:

> All right. Ladies and gentlemen, we have received all the evidence that we're going to get in this case. We're sort of in a box. This courtroom is not available next week. In fact, the other courtroom is not really suitable to have evidence presented.
>
> I don't think you want to come back tomorrow, do you? I mean, anybody? So my preference is to work on this evening. Anybody that can't do that, tell me why.
>
> All right. . . . The attorneys are going to make their closing argument—that's probably going to be over two hours and half, about that; and I'll instruct, and that's about 20 minutes or so—before we get it to you. So you can see that's going to be close to 7:45 or 8:00 o'clock, but I'd like to press on.

At that point, Sprague's counsel asked the court if it would be appropriate to question the jurors to see if continuing to deliberate was "going to put an undue hardship on any of them," or whether it would "prevent them from deliberating." The court responded that it had already asked the jury to identify any problem deliberating would pose, but none of them indicated it would. Golson's counsel claimed that the court had acted "very skillfully," and told the district judge: "You're a federal court judge sitting at the bench who said nobody wants to come back here tomorrow. Who's going to disagree with you?" Sprague's counsel then stated that he would prefer continuing on Saturday instead of that evening. The

court, however, determined that "regardless, we're going to press on this evening as long as the jury's able to endure it.  So let's operate on that assumption."

Sprague orally renewed his motion for a judgment of acquittal, restating his argument that the government had failed to put forth sufficient evidence to show that he and Golson possessed, or conspired to possess, dogs for the purpose of using them in a fighting venture.  The court, while finding that it was "questionable" whether the government had shown that Sprague and Golson knowingly committed each count of the indictment for the purpose of dogfighting, reserved ruling on the motion pending the jury's final verdict.  Golson moved for a judgment of acquittal on, essentially, the same grounds, and the court issued the same ruling as it had as to Sprague.

After the parties' closing arguments, the district court instructed the jury, inter alia, that for Count 1, the government only needed to prove that a defendant conspired to violate one of the subsections under § 2156 charged in the indictment. The parties did not raise any objections to this instruction.  The jury began deliberating around 7:45 PM Friday evening.

Just before midnight, the jury submitted a question regarding the elements of the crime to the district court.  The court brought the jurors back into the courtroom and gave an additional instruction addressing this question.  Then, the court stated:

10

Let me remind you that it's now two minutes after midnight. It's now tomorrow [Saturday, February 29, 2020]. I don't want to keep you here all evening. And it's up to you what you want to do; but if you want to stay, we will stay. But it's your choice, and we will do what you want to do.

So with that, ladies and gentlemen, let me ask you to retire back to the jury room and continue your deliberations.

After the jury resumed deliberations, Golson's counsel stated: "I just think—they've been here now for 15 hours, and I think that at some point nobody gets a fair shake when a jury works that long," to which the court responded that the jurors were sincerely trying to finish. The court called a recess pending a verdict.

Eventually the jury returned a note to the district court stating that they could not reach a decision that night and asking what their options were. Then, at 1:12 AM, the district court called the parties back into the courtroom. The court asked the parties for their positions, and Sprague stated: "I don't know if that's making progress or not." Golson stated that, because the jury had already worked for 16 hours that day, he believed it would be counterproductive to ask them to continue deliberating. The court then decided that it would not ask the jury to continue deliberating any longer that night. It recalled the jurors into the courtroom, asked if there were any conflicts, and after three jurors expressed that they would have difficulty returning the next day, it stated the following:

11

Well, I think you all feel that you can reach a verdict if you work at it.  And I'm going to ask you to come back.  And our working hours—you know, Monday is a working day for everybody here in the Court, so we'll have everything here.  So I'm going to ask you to come back Monday morning at 9:30.

. . . .

And we have a jury room [on a lower floor] that's all yours, so we can use that.  The courtroom down there has got other things that are scheduled, so we may have to take turns in the courtroom if we have to do that.  But I'm going to ask that you come back next Monday morning at 9:30.

Anybody that can't do that, period?  [No response indicated].  Okay.

Accordingly, the court dismissed the jury and instructed it to return at 9:30 on Monday morning, March 2, 2020.  Despite the preceding, at 1:24 AM, the jury asked for 30 more minutes to deliberate, and the district court called a recess.

At 2:12 AM, the district court recalled the jury into the courtroom, and the jury returned a verdict, as to Sprague, of guilty on Count 1, but not guilty on Counts 5, and 8–14.[4]  As to Golson, the jury returned a verdict of not guilty on all counts.

Several days later, Sprague filed a written motion for a new trial, arguing that the weight of the evidence did not support the verdict as to Count 1.  He also filed a written motion for a judgment of acquittal, in which he argued that there

---

[4] The jury's verdict form was marked "guilty" as to each of the three individual objectives of the conspiracy charged in the indictment.

was no evidence that he knowingly and willfully conspired to commit any of the three objects of the conspiracy with the intent to do something unlawful, or that he engaged in one of the overt acts in the indictment. Importantly, he did not argue, in either motion, that the court's actions instructing the jury at the end of the trial were coercive or that they deprived him of his constitutional rights.

The government opposed both of Sprague's motions, and the district court denied them in a single order, finding that the evidence supported the jury's verdict. At the sentencing hearing, the district court formally adjudged Sprague guilty of Count 1. With respect to the three objectives of the conspiracy as charged in Count 1, the court found that there was no evidence that Sprague knowingly and intentionally conspired and agreed with other individuals to (i) sponsor and exhibit dogs in animal fighting ventures, or to (iii) use an instrumentality of interstate commerce for commercial speech for purposes of advertising an animal for use in fighting ventures. However, it found that there was evidence that he knowingly and intentionally conspired to train, possess, sell, purchase, transport, deliver, or receive dogs for the purpose of having them participate in animal fighting ventures. It ultimately sentenced him to 18 months' imprisonment and 3 years of supervised release. Sprague appealed.

II.

We review a properly preserved claim that there was insufficient evidence to support a guilty verdict de novo. *United States v. Jiminez*, 564 F.3d 1280, 1284 (11th Cir. 2009). In doing so, we will "view[] the evidence in the light most favorable to the government, and draw[] all reasonable factual inferences in favor of the jury's verdict." *Id.* Where a defendant moves for acquittal at the close of the government's case, the defendant may preserve the claim by renewing the motion for judgment of acquittal at the close of the evidence. *See United States v. Bichsel*, 156 F.3d 1148, 1150 (11th Cir. 1998) (per curiam).

Where a party does not object to a jury's verdict, however, we will review a challenge on appeal only for plain error. *See United States v. Anderson*, 1 F.4th 1244, 1268 (11th Cir. 2021). "Plain error occurs when (1) there was an error, (2) the error was plain or obvious, (3) the error affected the defendant's substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 1268–69.

An appellant "must plainly and prominently" raise each claim on appeal. *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). To properly preserve a challenge to the sufficiency of the evidence, a defendant must raise the same specific challenges before the district court as he brings on appeal. *United States v. Baston*, 818 F.3d 651, 664 (11th Cir. 2016) ("When a defendant raises

14

specific challenges to the sufficiency of the evidence in the district court, but not the specific challenge he tries to raise on appeal, we review his argument for plain error.").

"The district court's denial of [a] motion[] for a judgment of acquittal will be upheld if a reasonable trier of fact could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt." *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000) (per curiam). We must sustain a verdict where there is a reasonable basis for it in the record. *United States v. Farley*, 607 F.3d 1294, 1333 (11th Cir. 2010). Accordingly, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990).

To convict Sprague of Count 1, the government had to show that he knowingly conspired to (i) "sponsor or exhibit an animal in an animal fighting venture"; (ii) possess, train, sell, transport, deliver, or receive an animal for purposes of having it participate in such a venture; or (iii) use an "instrumentality of interstate commerce for commercial speech for purposes of advertising an animal" for use in such a venture. *See* 18 U.S.C. § 371; 7 U.S.C. § 2156(a)–(c); *see also United States v. Dominguez*, 661 F.3d 1051, 1064–65 (11th Cir. 2011) ("Where an indictment alleges a conspiracy to commit several offenses . . . , the

15

charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses." (alteration adopted)).  To show that Sprague conspired to commit one or more of the foregoing offenses, the government had to prove: "(1) agreement between two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement." *United States v. Estepa*, 998 F.3d 898, 908–09 (11th Cir. 2021).  The government is not required to demonstrate that a formal agreement existed, and a conviction may be sustained on the basis of "circumstantial evidence [demonstrating] a meeting of the minds to commit an unlawful act." *See United States v. Arias-Izquierdo*, 449 F.3d 1168, 1182 (11th Cir. 2006).

As an initial matter, Sprague's argument concerning the language in his indictment is reviewable only for plain error because he did not object to the district court's jury instructions to that effect.  It fails under that standard because under our precedent the jury could have properly convicted him under any one of the objectives charged, and it ultimately convicted him of all three.  *See Dominguez*, 661 F.3d at 1064–65.

Sprague objected to the sufficiency of the evidence in his Rule 29 motions for acquittal and therefore preserved his right to appeal on that basis.  However, even under de novo review, there was sufficient evidence to convict Sprague.  For

16

example, the government presented evidence that Sprague agreed to sell puppies on behalf of his "kennel partner." Viewing all inferences in favor of the verdict, the jury could have properly found that Sprague's "kennel partner" was Golson, and that Sprague was selling the puppy, on his behalf, for the purpose of dogfighting. Such an inference would be supported by the ample circumstantial evidence the government presented—including the phone calls in which Sprague graphically described what appeared to be prior dog fights—and the fact that two dogs were fatally injured when they fought each other at Sprague's home. The same phone calls, as well as the fact that Sprague was the one advertising Golson's dog for sale, were sufficient to allow the jury to conclude that he participated in the venture knowingly and voluntarily. And any one of the overt acts charged in the indictment would have supported Sprague's conviction. For example, sufficient evidence existed to show Sprague picked up a dog from Peek and sold it to a buyer in Montana soon afterward, as Sprague admitted as much.[5]

And last, the jury was free to disbelieve Sprague's testimony and use it as substantive evidence of his guilt. *See United States v. Wilson*, 979 F.3d 889, 905 (11th Cir. 2020). In particular, Sprague admitted to talking with the informant about dogfighting in graphic detail, albeit he claimed to do this only to convince

---

[5] Although the jury acquitted Sprague of Count 5 that does not necessarily undermine it as a basis for his conviction on Count 1 because Count 5 included the additional element of "for the purposes of having the dog participate in an animal fighting venture."

the informant to meet him so he could beat the informant up for engaging in such activities. The jury was free to disbelieve Sprague's story. And the jury could have inferred that Sprague's knowledge of dogfighting, and his association with people engaged in dogfighting, was due to his own actual or planned involvement in dogfighting. Likewise, his argument that the evidence he presented in defense rendered the government's evidence insufficient lacks merit, as the government did not need to eliminate every possible innocent explanation for the evidence; his defense case was for the jury to weigh against the government's evidence. *See Young*, 906 F.2d at 618; *United States v. Grow*, 977 F.3d 1310, 1323 (11th Cir. 2020) (per curiam). For all of the foregoing reasons, sufficient evidence supported Sprague's conviction, and we affirm as to this issue.

### III.

District courts have broad discretion in conducting trials, and appellate courts will not intervene absent a clear showing of abuse of that discretion. *United States v. Gabay*, 923 F.2d 1536, 1541 (11th Cir. 1991). When appropriate, we will also review the district court's use of an *Allen* charge—something used when jury deliberations initially fail to result in a verdict—for an abuse of discretion. *See United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008). We will find an abuse of discretion "only if the charge was inherently coercive." *Id.* "In assessing

18

whether the charge was coercive, we consider the language of the charge and the totality of the circumstances under which it was delivered[.]"  *Id.*

In giving an *Allen* charge, the district court "instructs a deadlocked jury to undertake further efforts to reach a verdict."  *United States v. Bush*, 727 F.3d 1308, 1311 n.1 (11th Cir. 2013) (per curiam).  "Although we have criticized the practice of giving *Allen* charges, we have squarely held that they are permissible," so long as the district court does not "coerce any juror to give up an honest belief."  *Anderson*, 1 F.4th at 1269.  When a party fails to object to an *Allen* charge during trial, we review for plain error.  *Id.* at 1268.  "To determine whether an *Allen* charge is plain error, we must evaluate whether the particular charge is coercive in light of the facts and circumstances of the case and whether further instructions following timely objection could correct the problem."  *United States v. Taylor*, 530 F.2d 49, 51 (5th Cir. 1976) (per curiam) (italics added).[6]

Whether the district court gives an *Allen* charge or not, "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences."  *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966).  In particular, due process requires a jury that is capable and willing to decide the case on the evidence before it.  *United States v. Siegelman*, 640 F.3d 1159, 1182 (11th Cir.

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

2011) (per curiam).  We have rejected a coercion-based challenge to a district court's jury instruction when the instruction merely demonstrated the court's "effort to keep the jury updated about the schedule and the availability of the courtroom," and did not have a coercive impact on the jury's deliberations.  *Grow*, 977 F.3d at 1329.

We review Sprague's challenge to the district court's conduct on the last day of his trial for plain error only, as he failed to raise any objections in this respect below.[7]  Substantively, the court did not plainly err in this respect.  As an initial matter, Sprague concedes that the district court did not give a formal *Allen* charge.  Moreover, Sprague's more general assertions that the court coerced the jury by giving a "suggested or implied" *Allen* charge fails because it was the jury who decided to stay and deliberate, not the court.  Throughout the night, the court told the jurors multiple times that it was their decision whether to continue deliberating or not.  And eventually, the court announced to the jurors that they should come back on Monday and finish.  But then the jury requested more time, and ultimately reached a verdict on Saturday morning.  It follows that any instructions the court gave did not have a coercive impact and were within the court's discretion in

---

[7] While Golson's counsel expressed some concerns to the district court about allowing the jury to deliberate into Friday night, Sprague cannot rely on that to preserve his own challenge to the instruction.  *See United States v. Gray*, 626 F.2d 494, 501 (5th Cir. 1980) (a codefendant's objection is insufficient to preserve a defendant's argument where the defendant fails to raise an objection himself).

20

conducting a trial. *See id.* Therefore, the district court did not err, let alone plainly err, in allowing the jury to continue deliberating and reach a verdict, and we affirm Sprague's conviction.

**AFFIRMED.**